GENERAL MOTORS V. BURRY

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-216-CV

GENERAL MOTORS CORPORATION APPELLANT

V.

CHRIS BURRY, STACEY BURRY, AND APPELLEES

CHRIS BURRY, AS NEXT FRIEND FOR

RACHEL BURRY, SARAH BURRY, AND

MEGHAN BURRY, MINORS

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

OPINION ON REHEARING

------------

Upon consideration of appellant General Motors Corporation’s motion for rehearing, we deny the motion; however, we withdraw our opinion and judgment of June 29, 2006 and substitute the following to make a nonsubstantive clarification.

I.  Introduction

This is a classic battle of the experts case:  a products liability design defect case arising out of a traffic accident in which Stacey Burry, a passenger in a 2001 Chevrolet Suburban, was permanently brain damaged.  Appellant General Motors Corporation (GM), the manufacturer of the Suburban, appeals from a jury verdict finding that GM was liable for forty-nine percent of Stacey’s injuries because of a design defect in the Suburban and assessing approximately $38 million in damages against GM and Carol Reid, the driver of the Suburban, whom the jury found fifty-one percent responsible.
(footnote: 1)  In five issues, GM contends that (1) there is no evidence that a design defect in the Suburban caused Stacey’s injuries, (2) there is no evidence of any design defect in the Suburban, (3) several of the trial court’s evidentiary rulings constitute reversible error, (4) the jury was biased, unqualified, and erroneously instructed, and (5) the evidence is legally and factually insufficient to support the jury’s damage awards.  We modify the judgment to delete the bystander damage awards and affirm it as modified.

II.  Background Facts

On January 27, 2003, Stacey, her mother Carol, and Stacey’s three daughters, Rachel, Sarah, and Meghan, were traveling eastbound on Interstate 30 near Sulphur Springs, Texas.  Carol was driving the 2001 Chevrolet Suburban, and Stacey was the front passenger.  The three girls were in the middle seats, with Rachel directly behind Stacey.  

Carol exited the interstate and immediately attempted to turn right into a shopping center, crossing double white lines to do so.  As she was moving across the access road, an eighteen-wheeler, which was traveling in the access road, struck the Suburban.  The eighteen-wheeler’s left front fender initially hit the Suburban near its right rear wheel.  The impact rotated the front right side of the Suburban into the front of the eighteen-wheeler so that the Suburban and eighteen-wheeler were perpendicular to each other and the eighteen-wheeler was pushing the Suburban sideways for a short time.  Then the Suburban spun off of the eighteen-wheeler in a clockwise motion once or twice and landed in some dirt on the right side of the access road.

Rachel, who was closest to the initial impact, suffered a contusion on her head and several breaks in her right leg.  The other girls had no injuries.  Carol was knocked unconscious but otherwise had no injuries.  Stacey, however, struck the B-pillar—the part of the Suburban frame between the front passenger section window and middle section passenger window—as it intruded into the passenger compartment.
(footnote: 2)  The Suburban was equipped with front and side airbags, but no airbags deployed in the accident.  Stacey was in a coma for ten weeks and suffered severe brain damage as a result of her injuries. 

Stacey, her husband Chris, and Chris as next friend for Rachel, Sarah, and Meghan, sued GM and Carol alleging that design defects in the Suburban and Carol’s negligence caused Stacey’s injuries.  After a nine-day trial, a jury found Carol fifty-one percent liable, and GM forty-nine percent liable, for Stacey’s injuries.  The jury also awarded appellees approximately $38 million in damages.

III.  No-Evidence Issues

In its first two issues, GM contends that there is no evidence to support the jury’s findings that the 2001 Suburban had a design defect and that if there was a defect, it caused Stacey’s injuries.  We will review these issues first.  
See Gross v. Burt
, 149 S.W.3d 213, 229 n.12 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh’g).

A.  Standard of Review

A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999); Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960).  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.  
City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).  When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.  
Kindred v. Con/Chem, Inc.
, 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).

Any ultimate fact may be proved by circumstantial evidence.  
Russell v. Russell,
 865 S.W.2d 929, 933 (Tex. 1993).  A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case.  
Id
.  However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla.  
Blount v. Bordens, Inc.
, 910 S.W.2d 931, 933 (Tex. 1995).
  Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted.  
Wal-Mart Stores, Inc. v. Sturges
, 52 S.W.3d 711, 715 (Tex. 2001).

B.  Existence of Design Defect

GM contends that there is no evidence that the 2001 Suburban had any design defects because appellees “offered only unqualified speculation to support their theory that GM’s design was unreasonably dangerous.”  Appellees’ theory at trial was that the Suburban should have had a dual-sensor system governing deployment of the side airbag, that it should have had a side airbag with head protection instead of just thorax protection, and that the B-pillar should have contained extra padding.

1.  Qualifications of Appellees’ Experts

As a threshold matter, GM contends that appellees’ experts were not qualified to opine about the design of GM’s side airbag system and any proposed alternatives to it; therefore, the trial court erred by allowing their testimony. 

A witness with the appropriate knowledge, skill, experience, training, or education is qualified to testify as an expert.  
Tex. R. Evid.
 702; 
Roberts v. Williamson
, 111 S.W.3d 113, 121 (Tex. 2003); 
Toshiba Machine Co., Am. v. SPM Flow Control, Inc.
, 180 S.W.3d 761, 778 (Tex. App.—Fort Worth 2005, pet. granted, judgm’t vacated w.r.m.).  Whether an expert is qualified under rule 702 is a preliminary question to be decided by the trial court, and the party offering the expert’s testimony bears the burden of proving the witness’s qualifications.  
Gammill v. Jack Williams Chevrolet, Inc.
, 972 S.W.2d 713, 718 (Tex. 1998); 
Broders v. Heise
, 924 S.W.2d 148, 151 (Tex. 1996).  The decision to admit expert testimony is within the trial court’s discretion and will not be disturbed on appeal unless the trial court has abused its discretion.  
Gammill
, 972 S.W.2d at 718-19; 
Toshiba
, 180 S.W.3d at 778.

In deciding whether an expert is qualified, the trial court “must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion.”  
Helena Chem. Co. v. Wilkins
, 47 S.W.3d 486, 499 (Tex. 2001).  General experience in a specialized field is insufficient to qualify a witness as an expert.  
Pack v. Crossroads, Inc.
, 53 S.W.3d 492, 506 (Tex. App.—Fort Worth 2001, pet. denied).  “What is required is that the offering party establish that the expert has ‘knowledge, skill, experience, training, or education’ regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject.”  
Broders
, 924 S.W.2d at 153.

GM challenges the qualifications of Don Friedman and Geoff Mahon, experts appellees proferred to testify about the design of the Suburban’s side impact protection system.  Specifically, Friedman testified that the “occupant protection system” in the Suburban “did not provide the protection that would be expected in a side impact, and it didn’t perform in a way that one would expect in . . . an accident of this severity.”  Friedman’s testimony focused on whether a side airbag would have protected Stacey from the interior of the passenger compartment if it had deployed.  Mahon, an airbag sensor engineer, testified regarding the deficiency of the sensing system for the passenger side airbag and opined that a safer alternative system would have included a second sensor to increase the likelihood of deployment of the side airbag.

GM contends that Friedman was not qualified because he “last worked in the automotive industry over twenty years ago and has no experience with side airbags.”  GM points out that Friedman “never ran a crash test with side impact airbags, never designed a side impact airbag, never designed a vehicle with side impact airbags, and never wrote any papers about side impact airbags.”

Friedman testified that he had been involved in vehicle design for fifty-seven years and that he had worked for GM designing vehicles from 1960-68.  He had designed fifteen cars and six “other vehicles.”  After leaving GM, Friedman founded an automotive research and development company.  Friedman testified that he had been investigating injuries that occur in real world accidents since 1970, about thirty-five years.  He agreed that in his research he had investigated how an occupant moves once a vehicle is contacted. 

Friedman testified on voir dire that he had never run a crash test with side airbags, nor had he ever personally designed a side airbag system.  Although he had written papers about side impacts, he had never written papers about side impact airbags.  But Friedman also testified that he had designed frontal airbags before.  He had also worked on designs to minimize side impact injuries in five vehicles.  Friedman had also worked on an experimental research safety vehicle for the federal government that was never manufactured, but that could protect unbelted occupants in a forty mile per hour side impact collision.   Friedman had built and tested airbags that protected unbelted occupants from fifty mile per hour impacts and authored numerous papers, reports, and government research on airbags, padding, and side impacts.  He had investigated about thirty rollover cases with Suburbans and CK vehicles.
(footnote: 3)  
 In his deposition testimony, Friedman stated that most of his work at that time was research and was mostly related to rollovers and rollover occupant protection, which included “some relationship to the side impact.”  In 1986 or 1988, he did computer modeling to analyze the performance of side impact airbags, but he had never done any statistical analysis of side impact airbags.  But when asked whether he had “done statistical analysis of crash conditions and their relationship to injuries,” Friedman answered, “Certainly.  That’s what I described as the basis for an appropriate design consideration.”  Friedman had looked at GM crash tests when side airbags deployed and how they kept a dummy away from the side of the vehicle. 

Friedman testified at trial that if the installed thorax side airbag in the Suburban had timely deployed, it would have kept Stacey’s body, and thus, her head, away from the intruding B-pillar and Suburban interior.  This opinion was based on Friedman’s study and reconstruction of the accident and his understanding of the way the human body interacts with intruding vehicle components during a collision.

Friedman was offered as an expert with knowledge of the consequences to and behavior of vehicles and occupants in crashes, including side impact crashes, and how to design vehicles to minimize the impact to occupants in vehicle crashes, including side impact crashes.  Based on the foregoing, we hold that the trial court did not abuse its discretion in determining that Friedman was qualified to testify on the actual subject on which he offered an opinion.

GM further contends that Mahon, an airbag sensor engineer, was not qualified to testify regarding the sensing system on the Suburban because Mahon testified that his role as a sensing engineer was limited to developing a sensing system based on criteria provided by the vehicle manufacturer.  He explained that his experience in the industry had been that the manufacturer decided how severe a crash must be before it wanted the airbag to deploy and then Mahon would design a system in which the airbag would deploy in crashes at least as severe as those dictated by the manufacturer.  According to GM, this testimony shows that “Mahon deferred to manufacturers’ deployment criteria and had no experience establishing this criteria himself.” 

Mahon testified that he began working as an airbag sensor engineer in 1987 for a company that designed airbags and airbag sensors for automotive companies.  That company at one point had “virtually 100 percent” of GM’s and Ford’s business.  Mahon eventually became a vice president of the company, which has since gone bankrupt. 

Mahon expanded on his explanation about how he designed sensors based on criteria provided by the automotive companies by adding that 

because the testing that is done in the industry doesn’t cover every possible crash, my role is a little bit more than just picking a point [for deployment] and saying if I meet that point, that’s fine.  You’ve got to look at meeting the severity requirements.  

Generally speaking, those severity requirements are based on injury criteria.

In an affidavit presented by appellees to the trial court pretrial, Mahon averred that “[o]ver the years, [he had] personally reviewed literally thousands of crash test accelerometer plots and [had] a comprehensive understanding of all aspects of air bag sensor development crash testing.”  He also averred that “[t]o ensure that our customers had at least a basic understanding of the principles of crash sensing,” he designed and taught a course known as Sensor 101 to engineers from various automotive companies, including GM.  In the course, Mahon covered “the difference between crush and passenger compartment sensing methodologies, sensor system design, sensor calibration, and other matters of interest to restraint engineers.”  According to Mahon, “[t]he course was designed to inspire discussions of ways to solve crash sensing problems . . . admittedly with . . . sensors” manufactured by his former company. 

Mahon further averred in the affidavit that “[a]s a result of the time spent in the automotive industry where [he] was involved in the design and manufacturing of air bag crash sensors, [he] gained considerable knowledge about how they perform under various conditions.”  From May 1988 through the early 1990s, Mahon was “responsible for the sensor calibration and simulation activities of the corporation.”  Mahon stated further that

[c]rash sensing for side impact crashes is no different in principle than crash sensing for frontal impact crashes.  The differences are in the details rather than the basic principles. . . .  The significant difference between side impact events and frontal events is that there is much less time to gather data and make a decision in a side impact than in a frontal impact. 

Mahon’s testimony and affidavit show that in order to design a side airbag sensing system based on manufacturers’ criteria, he had to have  comprehensive knowledge not only of 
how
 those sensors work, but 
when
 they must work based not only on the manufacturers’ criteria, but on injury criteria as determined by crash tests and industry knowledge.  We hold that the trial court did not abuse its discretion in determining that Mahon was qualified to testify about the actual subject on which he offered an opinion.

Thus, we conclude that the trial court did not abuse its discretion by determining that Friedman and Mahon were qualified to testify about the design of the Suburban’s airbag system and by denying GM’s motions to exclude their testimony. 

2.  Evidence of Unreasonably Dangerous Design and Safer Alternative Design

GM also contends that there is no evidence that the design of the side airbag system in the Suburban was unreasonably dangerous or that a safer alternative design existed. 

a.  Applicable Law

When a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that (1) there was a safer alternative design and (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.  
Tex. Civ. Prac. & Rem. Code Ann
. § 82.005(a) (Vernon 2005); 
Davis v. Conveyor-Matic, Inc.
, 139 S.W.3d 423, 429 (Tex. App.—Fort Worth 2004, no pet.).  A claimant must not only meet the proof requirements of the statute but must show, under the common law, that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risks involved in its use.  
Hernandez v. Tokai Corp
., 2 S.W.3d 251, 257 (Tex. 1999); 
Honda of Am. Mfg., Inc. v. Norman
, 104 S.W.3d 600, 604 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

b.  Side Airbag Design

Appellees contended at trial that Stacey’s side airbag should have deployed in this type of accident; GM contended that the deployment of a side airbag was not necessary in this type of accident and that GM specifically designed the side airbag system not to deploy in this type of accident.

1. Unreasonably Dangerous

GM first contends that it was entitled to a presumption—which appellees did not overcome—that the Suburban did not have a design defect because it had complied with standards promulgated by the National Highway Transportation Safety Administration (NHTSA)
(footnote: 4) for the side structures of vehicles, which for 2001 vehicles did not require manufacturers to install any type of side airbag whatsoever.
(footnote: 5)  To support its contention, GM cites 
section 82.008(a) of the civil practice and remedies code
 and
 Harper
.  
Tex. Civ. Prac. & Rem. Code Ann.
 § 82.008(a) (Vernon 2005); 
Harper
, 61 S.W.3d at 
124.

Section 82.008(a), which provides that a defendant in a products liability suit is entitled to a rebuttable presumption of no design defect when it shows it has complied with NHTSA minimum standards, applies only to suits filed on or after July 1, 2003.
(footnote: 6)  
Tex. Civ. Prac. & Rem. Code Ann.
 § 82.008(a).  This case was filed on May 28, 2003, so the rebuttable presumption in section 82.008(a) is not applicable here.

Harper
 held that “[c]ompliance with NHTSA regulations provides a 
presumption
 of no design defect.”  
Harper
, 61 S.W.3d at 124 (
citing 
Sims v. Washex Machinery Corp.
, 932 S.W.2d 559, 565 (Tex. App.—Houston [1st Dist.] 1995, no writ)) (emphasis added)
.  But 
Sims
 
stands only for the proposition that evidence of such compliance is strong and substantial—but not conclusive—evidence 
that a product was not defectively designed.  
Sims
, 932 S.W.2d at 565 (citing 
Lorenz v. Celotex Corp.
, 896 F.2d 148, 150-51 (5th Cir. 1990), which cites 59 
Tex. Jur. 3d
 
Products Liability
 § 67 (1988), for the same proposition in a case applying Texas law)
;
 
see also Coleman v. Cintas Sales Corp
., 40 S.W.3d 544, 548 n.1 (Tex. App.—San Antonio 2001, pet. denied).  Neither 
Sims
 nor 
Lorenz
 describes this characterization of the evidence—as strong and substantial, but not conclusive—as a “presumption.”
(footnote: 7)  Thus, we disagree with the Eastland Court of Appeals’s characterization of such evidence as a presumption.

Here, our review is for legal, not factual, sufficiency.  Because evidence that GM complied with NHTSA standards is not conclusive, it cannot render appellees’ evidence insufficient.  
See Martinez
, 977 S.W.2d at 334.  Thus, regardless of GM’s strong, substantial evidence of no design defect, we must, under the no-evidence standard of review, determine whether appellees’ design defect evidence is so weak as to be a mere scintilla or whether it is 
“some evidence,” i.e., more than a scintilla. 
 Kindred
, 650 S.W.2d at 63.

GM also contends that appellees failed to show that GM’s design was unreasonable because they failed to take into account the risk of injuries caused by deployment of the airbag, which GM and appellees refer to as inflation-induced injuries, and because they failed to offer any evidence that deploying the airbag at the time of the second impact near Stacey would have prevented an occupant from hitting the side of the Suburban.  
See
 
Coastal Transp. Co. v. Crown Cent. Petro. Corp.
, 136 S.W.3d 227, 232 (Tex. 2004); 
Harper
, 61 S.W.3d at 124.

According to Dr. Thomas Perl, GM’s accident reconstructionist, the eighteen-wheeler initially impacted the Suburban at an approximately thirty-degree angle at a speed of forty-three miles per hour,
(footnote: 8) but it was still traveling approximately thirty-nine miles per hour when it impacted the B-pillar “flush up against the Suburban,” which caused a change in velocity of the Suburban of thirty-one miles per hour.
(footnote: 9)  One of GM’s experts, Daniel Faust, testified by deposition that the side airbag should deploy when a 3,000 pound object crashed into the Suburban at a ninety-degree angle and a speed of thirteen to fourteen miles per hour or “if there’s a severe risk of injury to the occupant.”  
The evidence shows that one of GM’s performance goals was that the side airbag would have a deployment immunity (i.e, it would not deploy) in a ninety-degree side impact up to 17.5 miles per hour, and this result was achieved in tests presented to its Performance Assessment Committee (PAC).  Thus, there is evidence that when the eighteen-wheeler hit the B-pillar of the Suburban, (1) the front of the eighteen-wheeler was “flush” with the side of the Suburban and, therefore, the body of the eighteen-wheeler was at a right angle to the Suburban, (2) that it hit the B-pillar area of the Suburban at a speed greater than that at which the airbag was designed not to deploy, and (3) that it hit the B-pillar area of the Suburban at a speed greater than the thirteen or fourteen miles per hour at which GM’s expert testified the side airbag should deploy.

Friedman, Mahon, and Robert Caldwell, another of appellees’ experts who  reconstructed the accident, testified that the impact at the B-pillar was sufficiently severe to require deployment of the side airbag.  The interior of the Suburban intruded into the passenger compartment about eight to ten inches at the top and about twelve inches at the level of the window sill.  Rescue personnel had to use the Jaws of LifeⓂ to get Stacey out of the Suburban after the accident. 

The foregoing evidence is sufficient to support the conclusion that the side impact in this case was severe enough that the side airbag should have deployed and that a side airbag design that did not allow for the side airbag to deploy in this type of crash was unreasonably dangerous based on the severity of the crash.

GM contends, however, that it had designed the airbag not to deploy in an accident like Stacey’s because it was concerned about inflation-induced injuries and unnecessary deployments.  In May 1999, just a few months before the 2001 Suburban was to go into production, the PAC reviewed the airbag design and expressed concerns.  Specifically, the airbag did not timely deploy in a crash test involving a steel pole that intruded directly into the passenger compartment.  The PAC was also concerned that there was no “data, analysis, judgment or rational[e]” addressing the deployment of side airbags in “vehicle angle impacts” or “side impacts from light trucks.”  According to the PAC report, such impacts occur at high frequency in the field. 

The PAC was also concerned about the potential for injury due to inflation of the side airbags, particularly to children.  Ultimately, the PAC concluded that “[l]ack of necessary information is responsible for the inability to concur on several of the evaluation considerations.  However, performance is the issue in others.  In particular, the PAC felt the SIAB [side impact airbag] presented additional risk to small children and from potentially late deployment without any demonstrate[d] benefit.” 

Appellees’ expert, Mahon, testified that at the time of the May 1999 PAC report, GM  had two choices with respect to the side airbag problems—change the sensing system or re-evaluate its deployment goals.  But Mahon also testified that if GM’s goals were realistic, its only choice was to change the sensing system.  According to Mahon, GM’s goals were realistic, but its engineers declined to change the sensing system because it would have created a costly delay to the program. 

In an October 1999 PAC report, which was issued after GM had already put the 2001 Suburban into production, GM ultimately accepted the slower inflation time in the pole test because the sensing system could not be adjusted to timely deploy while simultaneously being immune to a door slam.  In other words, when GM experimented with making the airbag more sensitive to deployment, the airbag would deploy in unnecessary circumstances, such as when a door was slammed too hard.  The PAC report states that “[s]uch a potential increase in unnecessary deployments would be inappropriate because it would increase possible exposure to inflation[-]induced injuries.”  According to Mahon, when GM “drove up the calibrations to avoid the door slam, [it] ended up with late deployments on the pole crash.”  However, Faust explained that the crash in the pole test was unlike the crash here because the pole, being extremely narrow, slices into the vehicle and causes much more intrusion. 

The October 1999 PAC report also shows that in response to the PAC’s earlier concern about side impact crashes between the Suburban and light trucks, “[a]n explanation was provided . . . .  This crash sensing system evaluation was judged from the harder to sense FMVSS 214 barrier impacts.”  According to Mahon, the FMVSS 214 test is a “moving to formidable barrier” test, which was designed to be a test in which the sensor does not deploy.  Mahon could not understand how running a test in which the airbag specifically does not deploy would address the PAC’s concerns about the timing of deployment in a collision in which the airbag was supposed to deploy.  According to Mahon, the test presented to the PAC in October “doesn’t matter.” 

The October 1999 report also shows that GM’s engineers declined to perform an angled impact crash test because it was only required in Europe.  Mahon testified that the crash in this case was an angled impact and that data says that angled impacts account for “something like 30 percent” of side impacts. 

The trial court admitted evidence that there was only a minimal risk of inflation-induced injury due to deployment of side airbags; specifically, appellees offered an October 2001 NHTSA study, which identified no fatalities and only three reports of injuries, two minor, resulting from the deployments of side airbags as of the date of the study.  A GM internal document calculated this risk as “0.80 serious inflation[-]induced injury event per 12 million car years.”  The document also noted that this projection was “for unrestrained or improperly restrained children and is not adjusted for the positive effects of the warnings and increased public awareness.” 

Both Friedman and Dr. Carley Ward, appellees’ biomechanical engineering expert, testified that they had not seen any inflation-induced injuries from side airbags.  Mitchell Scherba, a GM safety director, also acknowledged that side airbags can be more “benign” in larger vehicles because there is more space between the occupant and the location where the airbag is mounted.  Moreover, Mahon testified that “you could still have inflation-induced injuries” in a wanted deployment.
(footnote: 10) 

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.  
City of Keller
, 168 S.W.3d at 819.  We therefore conclude that in determining whether GM’s design was unreasonable, the jury was entitled to weigh appellees’ evidence of the benefit of occupant protection from side airbag deployment in a crash of this type against GM’s evidence of the slight risk of inflation-induced injury and unwanted deployment and to determine based on that evidence that a design which favored the reduction of the slight risk of inflation-induced injury and unwanted deployment over occupant protection was unreasonable.
(footnote: 11)
 Based on the foregoing evidence, we conclude that appellees introduced more than a scintilla of evidence that the 2001 Suburban had a design defect that was unreasonably dangerous.

2. Safer Alternative Design

GM also contends that there is no evidence of a viable safer alternative design. In addition to proving that a product is unreasonably dangerous, a plaintiff must prove that (1) there was a safer alternative design, (2) the safer alternative design would have prevented or significantly reduced the risk of injury, without substantially impairing the product’s utility, and (3) the safer alternative design was both technologically and economically feasible when it left the manufacturer’s control.
(footnote: 12)  
Tex. Civ. Prac. & Rem. Code Ann.
 § 82.005(a)-(b); 
Gen. Motors Corp. v. Sanchez
, 997 S.W.2d 584, 588 (Tex. 1999); 
Bic Pen Corp. v. Carter
, 171 S.W.3d 657, 671 (Tex. App.—Corpus Christi 2005, pet. filed)
.  To establish a safer alternative design, a plaintiff must show that the alternative design would not, under other circumstances, impose an equal or greater risk of harm.  
Martinez
, 977 S.W.2d at 337.  The safety benefits from the proposed design must be “foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety.”  
Id
.; 
Costilla v. Crown Equip. Corp
., 148 S.W.3d 736, 739 (Tex. App.—Dallas 2004, no pet.). 

In support of their theory that a safer alternative design was available for the system, appellees “proposed the addition of a second side airbag sensor to be used alone or, optimally, in combination with inflatable head protection.” 
 GM contends that there is no evidence that the alternative system proposed by appellees would have “commanded deployment in time to cushion [Stacey’s] collision with the B-pillar.”  
GM also contends that the testimony of Friedman and Mahon with regard to Mahon’s proposed two-sensor system was conclusory and speculative and not based on any tests, studies, data, or other scientific support.  
See Earle v. Ratliff
, 998 S.W.2d 882, 890 (Tex. 1999) (“An expert’s simple ipse dixit is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.”); 
Gammill
, 972 S.W.2d at 726-27; 
see also Coastal Transp. Co.
, 136 S.W.3d at 232.  Specifically, GM complains that the evidence shows that the two-sensor system had never been implemented on an actual vehicle and no manufacturers had ever purchased the two-sensor system developed by Mahon’s former employer. 

Friedman, Mahon, and Dr. Ward all testified that a timely deployed side airbag would have prevented or reduced the risk of Stacey’s injuries.  Mahon opined that the airbag did not deploy here because GM chose a system with only one sensor to pick a calibration that would achieve door slam immunity even though it would not meet the requirements for a lot of potential crashes.  Mahon theorized that a second sensor located in the B-pillar would “make the sensing system twice as smart” by accurately and timely detecting events calling for “wanted deployments.”  Mahon thus concluded that a two-sensor system would have timely deployed in Stacey’s accident. 

Mahon testified that “something that we knew about in the late 1980s from frontal crashes, is that when you don’t get enough information in a crash . . . if you add another sensor, you now have two devices gathering information, two devices able to think about what’s going on, so you’re twice as smart.”  Mahon testified that when another sensor is added to the system, there is better deployment on the “must deploy” crashes and better immunity to the “must not deploy” crashes. 

To support his theory that a timely deployed airbag would have prevented Stacey from hitting the B-pillar, Mahon testified in conjunction with a video of a GM crash test in which a fourteen inch steel pole struck the door of a vehicle at eighteen miles per hour.  In that test, the airbag was able to timely inflate and protect the crash test dummy from the pole because the sensor was properly calibrated to timely deploy.  According to appellees, if a single sensor can sense and timely deploy in that test, then it is logical that a second sensor located in the B-pillar would also “command timely deployment” when being impacted by an eighteen wheeler going thirty-nine miles per hour.  
The record supports appellees’ contention.

According to the reconstruction performed by Caldwell—GM’s accident reconstruction expert—Stacey’s head was approximately five and one-half inches from the B-pillar at sixty milliseconds after the initial impact between the eighteen-wheeler and the Suburban, and it struck the B-pillar at the earliest at ninety milliseconds after impact.  Caldwell stated that these were conservative estimates and that a head attached to a body would travel toward the B-pillar a little slower than the free particle upon which he based his conclusion.
(footnote: 13)  The eighteen wheeler impacted the B-pillar at thirty to fifty milliseconds.  According to Caldwell, when the Suburban rotated around into the front of the eighteen-wheeler, the B-pillar was directly impacted. 

Using Caldwell’s measurements, Mahon opined that a properly designed sensor in the B-pillar would have detected the impact, commanded deployment, and caused the airbag to inflate in approximately ten milliseconds.  Thus, at sixty milliseconds into the accident, Stacey’s head would have been about five inches from the B-pillar, enough clearance for the airbag to inflate between her body and the side of the Suburban. 

Mahon testified in detail about a two-sensor system and stated that it provides better deployment in crashes in which deployment is necessary and also better immunity from unwanted deployments.  He described how having a sensor in the B-pillar works together with the more forward sensor in the door  to provide “better decision-making, [and] better discrimination.”  According to Mahon, “door slam immunity is trivial” with a two-sensor system because the two sensors detect opposite impacts and “have to come together” on a deployment decision.  Thus, you would have a much better chance of deployment in a crash like this one in which the initial impact was a little bit off (i.e., not at a ninety-degree angle).  We believe that Mahon sufficiently explained the basis for his testimony about how a two-sensor system would work based on his experience in developing frontal side airbag sensors as well as side airbag sensors.  That the two-sensor system had not been used on other vehicles in production does not render Mahon’s testimony speculative or conclusory.  
Cf. Norman
, 104 S.W.3d at 606 (holding that to prove safer alternative design, technology must be in existence or scientific knowledge to produce it must be reasonably achievable).

Friedman explained that the purpose of the sensor is to detect “the acceleration . . . of the surface to which it’s attached.”  The change in acceleration indicates a crash is occurring, and the sensor then sends a signal to the airbag inflator to deploy.  Thus, even though the initial impact was not near Stacey, if a sensor had been located in the B-pillar, it would have recognized that the vehicle was being pushed and detected the acceleration that caused Stacey to move toward the B-pillar.  Thus, Friedman’s testimony is consistent with Mahon’s.

Mahon compared videotapes from two GM crash tests:  one in which an airbag timely deployed and one in which an airbag did not timely deploy.  Mahon testified that these tests show that a timely deployed side airbag can hold an occupant away from intrusion and dramatically reduce head injuries.  Dr. Ward also used videos from GM crash tests to show how a properly inflated side airbag will keep a person’s head away from the interior of the vehicle.  Based on these test results and their experiences, both Mahon and Dr. Ward concluded that a timely deployed side airbag would have been out, inflated, and available for the protection of Stacey’s head.  And Dr. Ward stated that if the airbag had had head protection, it would have kept Stacey’s head even further away from the B-pillar. 

Dr. Ward testified that if the existing thorax bag had inflated, it would have tended to keep Stacey away from the B-pillar and when she reached it, she would have hit it with less force.  Even an inflated airbag with only thorax protection keeps the head further inboard than if an airbag had not been there.  According to Dr. Ward, the existing thorax bag may not have kept Stacey’s head from hitting the B-pillar altogether, but it would have prevented her from having irreversible brain injury because she would have hit it with less force.  Additionally, Dr. Ward explained that an airbag absorbs energy. 

Dr. Ward also testified that in all of her experience, she had never seen, and was not aware of, any problems with inflation-induced injuries from side airbags.
(footnote: 14)  She also testified that her research on alternatively designed airbags, i.e., side curtain airbags and other airbags with added head protection, shows that there is no inflation-induced injury risk with those designs, including with alternative airbags designed by GM.  
See Martinez
, 977 S.W.3d at 338 (holding that defendant’s evidence of a greater risk of harm was not conclusive; thus plaintiff’s evidence created a fact issue for the jury to resolve).

Based on the foregoing, we conclude that there is at least some evidence, more than a scintilla, of the existence of a safer alternative design.
(footnote: 15)  Having determined that the evidence is legally sufficient to support the jury’s finding that the Suburban possessed an unreasonably dangerous design defect and that a safer alternative design existed, we overrule GM’s second issue.

C.  Causation

GM contends in its first issue that even if there is sufficient evidence to support the jury’s determination that the Suburban suffered from a design defect, there is no evidence that the defect proximately caused Stacey’s injuries.  Specifically, GM contends that the testimony of appellees’ biomechanical expert, Dr. Ward, is conclusory, speculative, lacks probative value on its face, and is not grounded in the methods and procedures of science.  GM’s first three contentions are determinable on the face of the record.

1. Probative Value of Dr. Ward’s Testimony

Dr. Eugene George, Stacey’s doctor while she was at the hospital after the accident, testified that as a result of the accident, Stacey had a right occipital condyle fracture,
(footnote: 16) multiple facial fractures on her left side underneath her eye and on her nasal bone, a dilated, fixed (or “blown”) right pupil, a diffuse axonal injury to her brain stem, damage to the frontal lobes of her brain, and a traumatic subarachnoid hemorrhage.  According to Dr. George, Stacey’s right side injury was consistent with a forceful blow to the right, back side of the head.   When asked to explain what had to happen for Stacey to receive those injuries, Dr. George testified as follows:

This is a complex area when you try to work out how injuries occur.  In this case you have an injury to the base of the skull on the right side, and you have fractures on the left face.  And then you have some diffuse injuries within the brain in between.  It would appear that she had an injury on one side and -- and a counter injury that -- that caused her to go 
forward or backward
 on the other.  I think that’s probably safe to . . . say that . . . it occurred.  The unlikely, [sic] without some sort of a rotational and flection [sic] injury that she would have that kind of a occipital skull -- condyle fracture.

I guess my only caveat is after seeing a few decades of these injuries, the brain not only is . . . complex, but it’s in these complex structures and dura sacs within the brain that it’s hard to categorize injuries, the rotation, the translational forces and so forth.  As we try to set up a scenario for certain injuries, as we try to investigate how we can improve the treatment of them, it’s hard even to classify them together . . . .  Having said that, I would say that this patient had had some sort of . . . a lateral rotation injury, whether she was struck on this side 
and went forward
 and hit her head on that side -- on the left side or the reverse, it’d be a little difficult to say beyond that.  [Emphasis added.]

Dr. Ward testified that Stacey received her primary head injury from contacting the B-pillar as she moved back and to the right towards the B-pillar as the Suburban moved out from under her.  Dr. Ward based her determination by looking at the Suburban; Stacey’s X-rays, CAT scans, and medical records; Caldwell’s accident reconstruction; and the movements of a human volunteer in an exemplar vehicle.  She also saw slight marks on the B-pillar and deformation on the door window on Stacey’s side.  

Dr. Ward testified that the primary forces in the accident would have moved Stacey to the right and to the back and that Stacey’s injuries were consistent with a downward head injury.  She also testified that she could tell the initial impact with the B-pillar was the primary force in the accident because Stacey’s CAT scans showed swelling on the right side of her brain.  In addition, Dr. Ward explained that Stacey could have incurred the left-side injuries much more easily because the eye socket area is very easy to fracture and this type of impact is energy-absorbing, i.e., the face breaks to absorb energy and protect the brain.  Dr. Ward explained that people can get a lot of facial fractures with no brain injury because the face absorbs the shock of the blow.  She said that there was nothing in the event to pull Stacey hard to the left and that GM’s theory that the primary forceful blow was from the left was inaccurate because human bodies don’t rebound well; a person can’t have a rebound and subsequent impact with more energy than the first impact.  Dr. Ward admitted that a dummy’s head will rebound in such a circumstance, but that is because the dummy’s head is made of rubber. 

Dr. Ward theorized that the left side of Stacey’s face turned toward the door when the Suburban rolled off the eighteen-wheeler and spun around and that that caused the injuries to the left side of her face.  She stated that the only thing happening after the impact near Stacey was spinning, which would keep Stacey to the right.  According to Dr. Ward, if Stacey had rebounded to the left side and hit Carol’s head, Carol would have a corresponding head injury.  Carol was knocked unconscious, but she did not have any swelling, bruising, or other evidence that she had received a blow to the right side of her head.   Dr. Ward agreed that a diffuse axonal head injury is caused by movement of the brain relative to its attachments. 

GM contends that Dr. Ward’s testimony fails to account for the diffuse axonal injury diagnosed by Stacey’s own physician because that type of injury is not caused by a single blow, but by a rotational movement of the head.  GM also contends that Dr. Ward’s theory is based on speculation about how Stacey moved during the accident, rather than testing, studies, or data.  
See Volkswagen of Am., Inc. v. Ramirez
, 159 S.W.3d 897, 912 (Tex. 2004).

According to GM, “[i]t is undisputed that a diffuse axonal injury results when a force causes a person’s head to rapidly rotate and whip around.  Ward never explained what caused [Stacey’s] head to move in that way.”  Appellees contend, however, that this evidence is not undisputed.  Rather than confirming that a diffuse axonal injury occurs only from rapid rotational movement from side to side, Dr. George testified that a diffuse axonal injury occurs when an impact moves the brain from side to side or from front to back or any other way.  He also agreed that Stacey’s brain injury was consistent with a “heavy blow to the right side and back of [her] head.”  And the excerpt from Dr. George’s testimony that we previously quoted specifically contemplates Stacey’s head hitting something and then moving forward.  GM’s position also fails to take into account the fact that appellees’ experts testified that the Suburban “rapidly rotated” off of the eighteen-wheeler, which forced Stacey’s head down to the left and onto the window.  GM’s own expert based his disagreement with Dr. Ward’s theory on his view that a “very violent motion” pitched Stacey to the left.  But the jury was entitled to believe Dr. Ward’s testimony over the testimony of GM’s expert.  
See Morrell v. Finke
, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. filed).

Dr. Ward’s conclusions were based on her extensive knowledge about how human bodies, which she distinguished from crash test dummies in simulated accidents, move when forces are applied to them.  She explained how she came to those conclusions based on her examination of the forces applied in the accident, which she determined in part by examining the damage to the vehicle and the results of an accident reconstruction—a common method of determining after the fact what actually happened during an accident.  Dr. Ward even explained how it is impossible to know exactly what happened to a person in an accident because we cannot perform tests with real people.  We therefore conclude and hold that her testimony had probative value and was not speculative.

2.  Reliability of Dr. Ward’s Testimony

GM also contends that Dr. Ward’s testimony is unreliable because it fails to account for Stacey’s left-side injuries, the inward forces applied to the B-pillar (i.e., the fact that the B-pillar was intruding in on the structure as Stacey was moving toward it) as evidenced by the leftward (toward the driver’s side) tilting of Stacey’s seat, and Carol’s unconsciousness at the scene.

a. Standard of Review

Expert testimony must be relevant to the issues in a case and be based on a reliable foundation.  
Tex. R. Evid.
 702; 
E.I. du Pont de Nemours & Co. v. Robinson
, 923 S.W.2d 549, 553 (Tex.1995); 
Gross
, 149 S.W.3d at 237.   The trial court must make an initial determination of whether the expert’s testimony is relevant and reliable so as to be admissible.  
Robinson
, 923 S.W.2d at 557;  
Gross
, 149 S.W.3d at 237.  However, even when challenged expert testimony is admitted by the trial court, a party may later complain on appeal that the expert testimony is legally insufficient to support the judgment because it is unreliable.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 409 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998); 
Gross
, 149 S.W.3d at 237.  Unreliable expert testimony is not evidence.  
Merrell Dow Pharms., Inc. v. Havner
, 953 S.W.2d 706, 714 (Tex. 1997), 
cert. denied
, 523 U.S. 1119 (1998).

In determining whether expert testimony is reliable and, therefore, some evidence supporting the judgment, the appellate court must employ “an almost de novo-like review and, like the trial court, look beyond the expert’s bare testimony to determine the reliability of the theory underlying it.”  
Austin v. Kerr-McGee Refining Corp.
, 25 S.W.3d 280, 285 (Tex. App.—Texarkana 2000, no pet.); 
see Guadalupe-Blanco River Auth. v. Kraft
, 77 S.W.3d 805, 808 (Tex. 2002); 
Havner
, 953 S.W.2d at 713.  “An expert’s simple ipse dixit is insufficient to establish a matter;  rather, the expert must explain the basis of his statements to link his conclusions to the facts.”  
Earle
, 998 S.W.2d at 890.  The court does not focus on the correctness of the expert’s opinion, but on the reliability of the analysis the expert used in reaching his or her conclusions.  
Gross
, 149 S.W.3d at 237; 
State Farm Fire & Cas. Co. v. Rodriguez
, 88 S.W.3d 313, 319 (Tex. App.—San Antonio 2002, pet. denied) (op. on reh'g).

The supreme court has articulated six nonexclusive factors appellate courts should consider in determining whether scientific testimony is reliable:

(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) 

whether the theory has been subjected to peer review and publication; (4) the technique’s potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique.  
Havner
, 953 S.W.2d at 714; 
Robinson
, 923 S.W.2d at 557.   Scientific evidence that is not based on “the methods and procedures of science” is no more than a “subjective belief or unsupported speculation.”  
Robinson
, 923 S.W.2d at 557.  “If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable.”  
Havner
, 953 S.W.2d at 714.   In addition, if the expert’s conclusions from data are based upon flawed methodology, the testimony is unreliable even if the data is sound.  
Id
.; 
Gross
, 149 S.W.3d at 238.

The Texas Supreme Court has recognized that the 
Robinson
 analysis may not apply to certain types of expert testimony.  
Helena Chem. Co.
, 47 S.W.3d at 499 (citing 
Gammill
, 972 S.W.2d at 726); 
Gross
, 149 S.W.3d at 238.  In these types of cases, there must still be a reliable basis for the expert’s opinion.  
Helena Chem. Co.
, 47 S.W.3d at 499; 
Gross
, 149 S.W.3d at 238.  “Experience alone may provide a sufficient basis for an expert’s testimony” unless there is “too great an analytical gap between the data and the opinion proffered.”  
Gammill
, 972 S.W.2d at 726-27.  Thus, regardless of whether the 
Robinson
 factors are applied, the proponent of the expert testimony must prove that it is based upon a reliable foundation.  
Gross
, 149 S.W.3d at 238.

b. Analysis

GM contends that Dr. Ward’s testimony about how Stacey’s body and head moved during the accident is based on mere speculation about how Stacey moved in the accident and fails to close the analytical gap between Dr. Ward’s opinion and the evidence.

Dr. Ward testified about her qualifications and background at trial.  A biomechanical engineer, Dr. Ward had been working and determining how people got hurt in crashes for thirty-eight years.  She had a bachelor’s degree in mechanical engineering, a master’s degree in engineering mechanics, and a Ph.D. in biomechanics and dynamics.  She also attended medical school at UCLA for “a number of years” to study the structure of the human body. 

Dr. Ward testified that after she received her master’s degree, she “began to specialize in the study of dynamics, how things respond on impact.”  She worked in the auto industry after that and “utilized the dynamics of impact of structures at that time.”  Dr. Ward had also taught engineering and taught medical students how to investigate how injuries occur.  Dr. Ward had been on a national committee for the Department of Transportation “looking at how people are injured in car crashes” and had served on other similar committees:  “[o]n identifying injuries, on doing autopsies, [and] how to identify the injuries in the autopsy.”  Dr. Ward had also served for ten years as the deputy coroner at USC medical school. 

Dr. Ward testified that she had published peer-reviewed literature about how to investigate how head injuries occur and that she had written about fifty papers.  Moreover, she answered “Yes” when asked if she had developed “scientific models to absolutely determine reasonably what happened to people and how their head injuries occurred” and whether such models were used by engineers in the field. 

GM first claims that Dr. Ward’s testimony about Stacey forcefully hitting the B-pillar is suspect.  GM claims that Dr. Ward testified that Stacey’s head moved downward and the B-pillar hit her on the top of the head.  But Dr. Ward testified that the right side of Stacey’s head was impacted toward the back and just above her right ear.  GM also criticizes Dr. Ward’s testimony that swelling on the right side of Stacey’s head was an indication that the B-pillar hit Stacey on the right side of her head because the swelling was not identified until the day after the accident.  Dr. Ward explained that such swelling does not always occur at the point of impact on the same day; it can occur up to twelve to twenty-four hours after impact.  In addition, the EMT report taken on the day of the accident indicates external head injuries on Stacey’s right side.

GM also contends that Dr. Ward failed to account for the left-side fractures to Stacey’s face and that her testimony that after Stacey’s head hit the B-pillar, she went forward and hit the left side of her face on the windowsill is mere speculation.  Both Dr. Ward and Friedman testified that the forces applied when the Suburban started spinning to the right and off the eighteen-wheeler would have caused Stacey to pull hard to the right against the interior of the Suburban.  Dr. Ward also found a one-eighth inch deformation in the trim piece on the top of the windowsill next to where Stacey had been sitting.  

GM additionally appears to contend that because its expert concluded that the intrusion of the B-pillar caused Stacey’s entire body to move violently to the left (inward toward the center of the vehicle) and because Dr. Ward did not explain that conclusion, Dr. Ward’s testimony about how Stacey received her left-side injuries is somehow deficient.  But Dr. Ward, Caldwell, and Friedman all explained how Stacey’s seat would have moved under her instead of with her.  The jury was entitled to believe appellees’ experts over GM’s.  
Morrell
, 184 S.W.3d at 282.

GM also claims that Dr. Ward failed to account for Carol’s unconsciousness immediately after the accident.  But Dr. Ward testified that it is not uncommon for a person to lose consciousness after such an accident even if that person did not receive a blow to the head.  Further, GM’s implicit assertion that if Carol’s unconsciousness was due to a blow to the head, then that blow could have only come from Stacey’s head, does not negate Dr. Ward’s testimony.  Indeed, Dr. Ward’s testimony that Stacey’s head did not impact Carol’s is supported by the evidence that Carol had no external marks, bruises, or swelling on her head or any other indication that she had been hit in the head during the accident. 

GM further contends that Dr. Ward ignored the fact that Stacey’s seat was tilted inward as a result of the impact.  But rather than ignoring the tilting, as we have observed above, Dr. Ward testified that Stacey would have moved independently of the seat because it was moving out from under her and, thus, Stacey would still have moved the way the forces on her body were moving.  Friedman also agreed that what happened to the seat had nothing to do with what happened to Stacey even though she was belted in. 

Finally, GM argues that Dr. Ward failed to take into account the absence of any head injury to Rachel.  According to GM, Stacey’s injuries are inconsistent with Rachel’s, yet Rachel was on the same side of the Suburban as Stacey, seated directly behind her.  But Friedman distinguished their positions.  Rachel was injured more on the rest of her body because she was seated at the place of the greatest crush.  Rachel was not seated where her head could be impacted by, or could impact, the C-pillar.
(footnote: 17)  It is clear from most of the experts’ testimony, both appellees’ and GM’s, that the forces applied to Stacey and Rachel were different because of the two-impact scenario.  Dr. Ward did not find Rachel’s injuries to be a “useful tool” in determining how Stacey received her injuries; thus, her failure to account for Rachel’s injuries does not show that her testimony was unreliable.

As we have explained above, Dr. Ward did not fail to account for Stacey’s left-side injuries, the inward forces applied to the B-pillar, or Carol’s unconsciousness at the scene, as GM contends.  Based on Dr. Ward’s qualifications and experience in the study of how human bodies move and react when forces are applied to them, we conclude and hold that Dr. Ward’s causation testimony was reliable.

3.  GM’s Theory of Causation

In support of its contention that the evidence is legally insufficient to support the jury’s findings on causation, GM focuses heavily on its own theory of how Stacey received her injuries:  that Stacey’s brain injury was caused by impact with Carol’s head rather than any part of the vehicle.  GM’s expert testified at trial that although Stacey initially hit the right side of her head on the B-pillar, her brain injury was caused when she rebounded off the B-pillar and hit the left side of her head against Carol’s head.  But as we have already explained, Dr. Ward also testified as to her theory of how Stacey received her left-side injuries—that after Stacey hit her head on the B-pillar, the Suburban started spinning, which forced Stacey’s head to spin down and hard to the right against the windowsill—and we have determined that Dr. Ward’s testimony was reliable.  It is the province of the jury to resolve conflicts in the evidence.  
City of Keller
, 168 S.W.3d at 820.  In addition, as we have already observed, the jury was entitled to believe the testimony of appellees’ expert as to causation over the testimony of GM’s.  
See Morrell
, 184 S.W.3d at 282.  Thus, GM’s causation evidence does not render appellees’ causation evidence legally insufficient.

Based on our review of the entire record, we conclude that there is more than a scintilla of probative evidence that a design defect in the Suburban was a proximate cause of Stacey’s injuries.  We overrule GM’s first issue.

IV.  Evidentiary Rulings

In its third issue, GM contends that the trial court “repeatedly made evidentiary rulings that paved the way for a plea to the jury to render a verdict based on emotion, not law or fact.  Independently and cumulatively, these rulings were reversible error.”  Specifically, GM contends that the trial court abused its discretion by allowing appellees to introduce the Burry children to the jury in person, by excluding evidence of Carol’s negligence in causing the accident, by admitting appellees’ statistics and excluding GM’s statistics, and by admitting evidence more properly designated as rebuttal evidence during appellees’ case-in-chief.

A.  Standard of Review

A trial court’s rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard.  
Nat’l Liab. & Fire Ins. Co. v. Allen
, 15 S.W.3d 525, 527-28 (Tex. 2000).  An appellate court must uphold the trial court’s evidentiary ruling if there is any legitimate basis in the record for the ruling.  
Owens-Corning Fiberglas Corp. v. Malone
, 972 S.W.2d 35, 43 (Tex. 1998).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must determine whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id
.

B.  Introduction of Burry Children to Jury

GM contends that the trial court’s error in allowing appellees to introduce each of the Burry children to the jury caused irreparable harm.
(footnote: 18)  GM contends that this created an emotional spectacle in the middle of trial, that the harm is “manifest to any experienced trial lawyer,”
(footnote: 19) and that such harm cannot be undone because GM “could not possibly” conduct an effective cross-examination of Chris—Stacey’s husband and the children’s father—afterwards.  But GM failed to object to the introduction of the girls to the jury; thus, its complaint is waived.  
See 
Tex. R. App. P.
 33.1(a)
; 
Bushell v. Dean
, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh’g).

GM nevertheless contends that an objection was unnecessary due to the extreme emotional nature of the scene and the inevitable impact it must have had on the jury.  However, we are unable to determine from the face of the record the extent to which this might have impacted the jury.  The entire exchange between appellees’ trial counsel and Chris as stated in the record is as follows:

Q.  Chris, I would like for your permission just briefly to introduce - - or for you to introduce your daughters to the jury.  Is that okay? 

A.  It’s fine with me, sir.

Q.  Okay.

A.  May I step down, Judge?

THE COURT:  Yes.

(A brief interruption occurred.  Girls entered courtroom.)

Q.  Chris, if you’d just briefly introduce them to the jury, and we’ll let them go.

A.  This is - - This is Meghan, my - - my oldest, who is most like me.

And here are the twins.  And as I said, Rachel, with God’s little gift to us to tell them apart.

Thank you, girls.

Q.  Thanks, girls.

A.  Go on.

(A brief interruption occurred.)

Q.  Chris, you’ve done a great job of raising those girls.   I have three of my own, and I’m sure I would never have been able to do what you’ve been able to do.

Although it appears from the cold record that the introduction of the girls had the potential to have some emotional impact on the jury, we do not have the benefit of having witnessed the entire scene, and what is recorded in the record is not so egregious that we can say that the trial court abused its discretion, especially in light of the fact that it appears GM had every opportunity to object and chose not to do so.  Additionally, we note that the children, although minors represented by their father as next friend, are also parties to the lawsuit.  Generally, parties to a lawsuit are allowed to be in the courtroom at counsel table throughout the proceeding.  
See
 
Tex. R. Evid.
 614 (exempting party to suit from “the Rule”—exclusion from courtroom during other witnesses’ testimony).
(footnote: 20)
C.  Exclusion of Evidence of Carol’s Negligence

GM also contends that the trial court abused its discretion by excluding evidence that Carol’s negligence caused not only the accident but also Stacey’s injuries.
(footnote: 21)  Specifically, GM contends that it should have been able to introduce evidence that Chris testified under oath at a settlement hearing that he sued Carol for negligence and for causing Stacey’s injuries and that Chris had alleged in prior pleadings that 

24.  Defendant Carol Reid was the operator of the vehicle and thus owed a duty of ordinary care[;]

25.  Defendant breached her duty of care by not safely operating the vehicle[; and]

26.  Defendant’s negligence was 
a
 proximate cause of Plaintiffs’ 
injuries and resulting damages
.  [Emphasis added.]

Thus, GM claims it should have been able to cross-examine Chris about his suit against Carol and that the trial court abused its discretion by excluding the pleadings and Chris’s sworn testimony.  GM also contends that the trial court improperly excluded the testimony of Corporal Byron Irving, the investigating officer at the scene.  GM proferred Corporal Irving to testify about how Carol violated the traffic laws by making an illegal and unsafe turn across two double white lines.  

But the evidence about which GM complains is cumulative of other evidence.  
See Williams Distrib. Co. v. Franklin
, 898 S.W.2d 816, 817 (Tex. 1995).  The parties stipulated to the jury that Carol “turned when it was unsafe, and that was a violation of Texas traffic laws.”  Friedman agreed that Stacey’s injuries would never have occurred but for Carol’s turning in front of the eighteen-wheeler.  And Caldwell stated that he didn’t think there was “any doubt” that Carol’s conduct caused the accident.  He also said that “I think that she definitely turned across in front of the semi truck.”  Contrary to GM’s contentions, this cumulative evidence does not simply show that Carol’s conduct contributed only to the accident and not Stacey’s injuries; without the accident, there would have been no injuries whatsoever.  In addition, appellees never contended that GM was the sole cause of Stacey’s injuries; the charge asks in Question No. 3:  “Did the negligence, if any, of Carol Reid proximately cause the injury in question?”  The jury answered “Yes.”  It is clear that appellees were suing Carol, as well as GM, for causing Stacey’s injuries.  Thus, admitting Chris’s deposition testimony and pleadings, and additional evidence of the investigating officer’s report of how Carol turned in front of the eighteen-wheeler, was unnecessary.  
See id.

GM also contends that although the jury found that Carol was fifty-one percent responsible for Stacey’s injuries, with the addition of the complained-of evidence, the jury could have found that Carol was eighty percent responsible or more.  But we cannot engage in that kind of speculation about what the jury would have done, nor does GM present any evidence to show that the jury would have found Carol more at fault if the trial court had admitted additional, more detailed evidence of her negligence.
(footnote: 22)  We hold that the trial court did not abuse its discretion by excluding this evidence.

D.  Statistics

GM contends that the trial court abused its discretion by admitting appellees’ statistical evidence of other accidents as proof that the Suburban contained a design defect and by excluding GM’s evidence about the “real-world” performance of the Suburban as compared to other vehicles.  Appellees contend that their statistics were not introduced for the purpose of proving that the Suburban had a design defect and that GM’s statistics could not be used to prove that there was no design defect because they did not take into account reasonably similar vehicles and circumstances.

Specifically, GM complains about the admission of the following evidence of other accidents because appellees did not show “that the accidents were reasonably similar to”
(footnote: 23) Stacey’s or that the vehicles were similar to the 2001 Suburban:  an Insurance Institute for Highway Safety analysis of side impact collisions stating that from 1993 through 1996 there were 8,554 side impact fatalities, 3,000 to 5,500 side impacts with fatal head injuries, 35,800 side impacts with head injuries—including 15,000 from contacts with an interior pillar, and 602 fatalities that could have been prevented with side impact airbags with head protection; and a NHTSA statistic showing that 6,000 head injuries were caused by contact with the vehicle interior in side impact collisions.  GM also claims that appellees were allowed to “misleadingly attribute those statistics to the proposed designs.” 

The evidence which GM complains was improperly excluded is a risk analysis performed by Dr. Michelle Vogler, which compares the 2001 Suburban to other vehicles, regardless of differences in design or accident circumstances.  Dr. Vogler acknowledged that her analysis was not based on reasonably similar vehicles and events.

Regardless of whether the trial court abused its discretion in admitting appellees’ evidence and excluding GM’s, we hold that such an error would not be reversible.  To obtain reversal of a judgment based upon the admission or exclusion of particular evidence, the appellant must show that any error in admitting or excluding the evidence was reasonably calculated to cause and probably did cause rendition of an improper judgment.  
Tex. R. App. P.
 44.1;  
Gee v. Liberty Mut. Fire Ins. Co.
, 765 S.W.2d 394, 396 (Tex. 1989); 
Bartosh v. Gulf Health Care Center-Galveston
, 178 S.W.3d 434, 439 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  To establish harm (i.e., that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment) as to the exclusion of evidence, the appellant must demonstrate that the excluded evidence was both controlling on a material issue and not cumulative of other evidence.  
Williams Distrib. Co.
, 898 S.W.2d at 817; 
Bartosh
, 178 S.W.3d at 439.

Here, regardless of the purpose for which appellees proferred their statistics—as background about the general risk and severity of side impacts or as evidence of a design defect—there was other legally sufficient evidence of design defect to support the jury’s verdict.  
See supra
 section III.B.2.  Moreover, GM’s “rebuttal” evidence was not admissible on the issue of design defect because it did not compare reasonably similar vehicles and events.  Thus, we conclude that the trial court did not reversibly err by excluding GM’s statistics and admitting appellees’.  
See Nissan Motor Co.
, 145 S.W.3d at 138-39; 
Martinez
, 977 S.W.2d at 340-41.

E.  Rebuttal Evidence

GM finally claims that the trial court abused its discretion by allowing appellees to introduce evidence in their case-in-chief that was more properly characterized as rebuttal evidence.  But GM did not object to the admission of this evidence on those grounds.  Thus, its complaint is waived.  
See 
Tex. R. App. P.
 33.1(a)
; 
Bushell
, 803 S.W.2d at 712.

Having determined that the trial court did not abuse its discretion with respect to GM’s complained-of evidentiary rulings, we overrule GM’s third issue.

V.  Juror Issues and Jury Instructions

In its fourth issue, GM contends that some jurors were biased and unqualified and that the jury was improperly instructed.  More specifically, GM claims that the trial court should have excluded two jurors for cause because they both stated they had lost loved ones in accidents, that the trial court erred by instructing the jury that damages should not be reduced based on Carol’s negligence, and that the trial court should have instructed the jury that the Suburban should be presumed not to be defective.

A.  Alleged Juror Bias

GM contends that the trial court should have excluded two veniremembers for cause.  One veniremember said that his brother had been killed in a car accident the previous year and that he had been involved in “a fight” with GM.  Another veniremember stated, “I don’t really think I can,” when asked whether she could set aside her sympathies for appellees because she had a relative who had been killed in a car wreck due to head injuries. 

A person who is biased or prejudiced against a party or a type of claim is disqualified to serve on a jury.  
Tex. Gov’t Code Ann.
 § 62.105(4) (Vernon 2005); 
Hyundai Motor Co. v. Vasquez
, 189 S.W.3d 743, 749 (Tex. 2006).  Bias is “an inclination toward one side of an issue rather than to the other . . . .  [I]t must appear that the state of mind of the juror leads to the natural inference that he will not or did not act with impartiality.  Prejudice . . . means prejudgment, and consequently embraces bias.”  
Hyundai Motor Co
., 189 S.W.3d at 751 (quoting 
Compton v. Henrie
, 364 S.W.2d 179, 182 (Tex. 1963)); 
Hafi v. Baker
, 164 S.W.3d 383, 385 (Tex. 2005).  The relevant inquiry is not where the juror starts but where he or she is likely to end.  
Hafi
, 164 S.W.3d at 385.

A juror is disqualified as a matter of law if the juror unequivocally cannot be fair and impartial because the juror’s feelings about a party or type of claim are so strong that the juror’s verdict will be based on those feelings and not on the evidence.  
Buls v. Fuselier
, 55 S.W.3d 204, 210 (Tex. App.—Texarkana 2001, no pet.).  An equivocal expression of bias, however, is not grounds for disqualification as a matter of law.  
Cortez v. HCCI-San Antonio, Inc.
, 159 S.W.3d 87, 94 (Tex. 2005).

If a juror’s bias or prejudice is established as a matter of law, the trial court has no discretion and must disqualify the juror.  
See id.
 at 93; 
Malone v. Foster
, 977 S.W.2d 562, 564 (Tex. 1998).  If a juror’s bias or prejudice is not conclusively established as a matter of law, we review the trial court’s decision on a challenge for cause for an abuse of discretion.  
Cortez
, 159 S.W.3d at 93
.  In determining whether the trial court abused its discretion, we must review the entire examination of the juror.  
Id
.  Because the trial judge is actually present during voir dire, he or she is “in a better position . . . to evaluate the juror’s sincerity and . . . capacity for fairness and impartiality.”  
Id
. (quoting 
Swap Shop v. Fortune
, 365 S.W.2d 151, 154 (Tex. 1963)).  “It can be a close question whether a juror’s response indicates a prejudice due to personal animus or bias, rather than a fair judgment of the previewed evidence.”  
Hyundai Motor Co.
, 189 S.W.3d at 754.

In response to questioning, veniremember 10 said that his brother had been killed in a car wreck the year before trial and that “all -- us and GM and all them, they had a fight about that, so I won’t get into all that, but I wouldn’t -- I wouldn’t want to sit on a case like this, if I could get out of it.”  When asked if he would be for or against GM, veniremember 10 said, “I have no idea.  I just listened to the case.  I sat there -- went through it one time with my brother, listened to it, and I’d probably -- I couldn’t tell you which way I would be.”  Nothing in veniremember 10’s equivocal response indicates that he had any inclination for or against GM, i.e. bias, or that he had prejudged any aspect of the case, i.e., prejudice.  We hold that the trial court did not abuse its discretion by denying GM’s challenge for cause of veniremember 10.

Veniremember 17 stated that her “daughter’s baby half-sister was killed in a wreck due to head injuries.”  In response to a question from GM asking whether any of the veniremembers would have “a problem with sympathy in the [Burry] family . . . and putting that aside in dealing with the facts of the airbags in this case,” veniremember 17 stated, “I will have, because I see what my daughter and her family went through when that happened to her sister.  It was a serious head injury.”  GM’s counsel then asked, “And because of your experience with that understandably, you’re not going to be able to put that aside -- put that sympathy aside and make a decision based solely on the evidence in this particular case?,” to which veniremember 17 responded, “I don’t really think I can.” 

When GM challenged veniremember 17 for cause, the trial court observed, “She said I don’t think I can.  She never said she couldn’t.”  Although veniremember 17’s responses can be interpreted as indicating that she could not set aside her sympathy for appellees because of her prior experiences, the words she used were also equivocal.  Because we were not in a position to observe veniremember 17 as the trial court was, we know nothing about her demeanor, expressions, tone, or vocal inflection when she stated those words; on their face, they do not conclusively show bias or prejudice.  The trial court’s observation appears to indicate that veniremember 17 was equivocating when she gave her response.  Thus, we cannot hold that the trial court abused its discretion in denying GM’s challenge for cause to veniremember 17, even if we might have come to a different conclusion.

B.  Sufficiency of Evidence Supporting Bystander Damages

In its fourth issue, GM also claims the trial court erred by instructing the jury, over its objection, that it could award Chris, as next friend for Rachel, Sarah, and Meghan, bystander damages for mental anguish suffered by the girls as a result of witnessing the accident and Stacey’s injuries because this is a strict liability design defect case, as opposed to a negligence case.  But in a subissue of its fifth issue, GM also challenges the sufficiency of the evidence to support such damages.  Because GM’s sufficiency challenge is potentially dispositive, regardless of whether such damages are even available here, we will address that subissue first.

GM contends that there is no evidence or factually insufficient evidence to support the jury’s verdict on bystander damages because none of the girls testified, and no one else testified, about the girls’ reactions as bystanders to the accident and Stacey’s injuries.  Although other witnesses testified about the effect that Stacey’s subsequent mental impairment had on the girls, GM contends that this evidence is insufficient to support the award of bystander damages to the girls.  

To recover as a bystander, the plaintiff must establish the following:

(1) The plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it;

(2) The plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and

(3) The plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

United Servs. Auto. Ass’n v. Keith
, 970 S.W.2d 540, 541-42 (Tex. 1998); 
Lions Eye Bank of Tex. v. Perry
, 56 S.W.3d 872, 878 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  Texas law requires the bystander’s presence when the injury occurred and the contemporaneous perception of the accident.  
Keith
, 970 S.W.2d at 542; 
Lions Eye Bank
, 56 S.W.3d at 878. 

GM’s sufficiency challenges appear to relate to the second element of bystander damages, that the plaintiff suffered shock as a result of the direct emotional impact from a sensory and contemporaneous observance of the accident.  GM claims that there is no evidence that the girls actually saw Stacey’s head hitting the B-pillar and that there is no evidence of the girls’ reactions to the accident as opposed to the later manifestations of Stacey’s injuries.

The driver of the eighteen-wheeler testified that when he got out of his truck after the accident, the lady on the passenger side in the front seat was unconscious, and the little girl in the back seat was crying.
(footnote: 24)  A witness who saw the accident in his rearview mirror testified that when he turned around and went back to the Suburban, one of the little girls “seemed fine,” one “acted out of it,” and the other was screaming.  The girls’ counselor testified that they were traumatized initially when she first began treating them but that was because they did not know if their mother was going to live or die and “[t]o deal with that trauma with them was the first initial shock.”  We find no evidence in the record specifically describing the girls’ mental and emotional reactions to the accident itself.

Appellees contend that the “shock” and “direct emotional impact” elements of a bystander recovery cause of action can be inferred from the fact that a bystander observes an accident and injury sensorily and contemporaneously.  
See Dawson v. Garcia
, 666 S.W.2d 254 (Tex. App.—Dallas 1984, no writ).  The issue in 
Dawson
, however, was whether two children who were knocked unconscious in an automobile accident in which their father sustained injuries that killed him could be said to have contemporaneously perceived the accident.  
Id
. at 258.  Whether or not the record supported a finding that the plaintiffs in that case suffered shock and direct emotional impact as a result of their “experiential perception” of the accident and their father’s injuries was not at issue.  
See id
. at 260.  Thus, we decline to extend the holding of 
Dawson
 as advocated by appellees.

In other bystander cases, there was also evidence introduced at trial establishing the nature and extent of the shock and emotional impact suffered by the bystander as a result of perceiving a family member’s injury in an accident.  
See, e.g., Gen. Motors Corp. v. Grizzle
, 642 S.W.2d 837, 843-44 (Tex. App.—Waco 1982, writ dism’d); 
Landreth v. Reed
, 570 S.W.2d 486, 488 (Tex. Civ. App.—Texarkana 1978, no writ); 
Dave Snelling Lincoln-Mercury v. Simon
, 508 S.W.2d 923, 925-26 (Tex. Civ. App.—Houston [1st Dist.] 1974, no writ).  Here, there is no such evidence; the only evidence about the emotional impact on the girls relates to their post-accident fears about their mother’s survival and their diminished relationship with her afterwards.  Thus, although we believe that GM is incorrect in its assertion that there is no evidence that the girls “experientially perceived” the accident and Stacey’s injuries, we conclude that the evidence is legally insufficient to support the jury’s findings on bystander damages because there is no evidence that the girls experienced shock and direct emotional impact as a result of witnessing the injury to Stacey at the time of the accident.  We therefore hold that there is legally insufficient evidence to support the jury’s award of bystander damages to the three girls.

Because there is no evidence to support such a damages award—regardless of whether such damages could be awarded in a strict liability cause of action—we need not address GM’s subissue regarding the availability of such damages.  
See
 
Tex. R. App. P.
 47.1; 
Tex. Mut. Ins. Co. v. Surety Bank, N.A.
, 156 S.W.3d 125, 131 n.4 (Tex. App.—Fort Worth 2005, no pet.)

C.  No-Reduction-of-Damages Instruction

GM also claims that the trial court erred by instructing the jury that it should not reduce appellees’ damage awards because of any negligence of Carol.  But GM did not object to this instruction until it filed a motion for new trial.  Thus, GM failed to preserve this issue for review.  
See
 
Tex. R. App. P.
 33.1(a); 
Tex. R. Civ. P.
 274; 
In re W.J.H.
, 111 S.W.3d 707, 711 (Tex. App.—Fort Worth 2003, pet. denied); 
see also Osterberg v. Peca
, 12 S.W.3d 31, 55 (Tex. 2000) (reiterating prior holding in 
Holland v. Wal-Mart Stores, Inc
., 1 S.W.3d 91, 94 (Tex. 1999), that when trial court must resolve legal issue before jury can properly perform its fact finding role, party must object in time for trial court to make appropriate ruling without having to order new trial), 
cert. denied
, 530 U.S. 1244 (2000).

D.  Rebuttable Presumption Instruction

GM argues that the trial court erred by refusing to instruct the jury that “the law presumes that the 2001 Chevrolet Suburban was not defective” because it complied with governmental regulations regarding side airbags.  But as we have already discussed in section III.B.2.b.1 of this opinion dealing with evidence of a design defect, no such presumption arose; rather, this evidence is only considered to be strong and substantial, not conclusive.  Moreover, no presumption arose under section 82.008(a) of the civil practice and remedies code because it applies only to suits filed on or after July 1, 2003 and this suit was filed May 28, 2003.  
See
 Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 5.02, 2003 Tex. Gen. Laws 847, 861-62, 899.  Thus, the trial court did not err by refusing to include a rebuttable presumption instruction in the charge.

We overrule GM’s fourth issue, but we sustain that portion of GM’s fifth issue challenging the legal sufficiency of the evidence to support the jury’s bystander damage awards.

VI.  Damage Awards

In the remainder of its fifth issue, GM contends that parts of the jury’s $38 million damage award are unsupported by either legally or factually sufficient evidence, or both.  According to GM, the damage awards should be eliminated or substantially reduced.

A.  Standard of Review

We apply the same no-evidence standard of review to legal sufficiency challenges to the evidence supporting a jury’s damage award as we do to a legal sufficiency challenge on a jury’s liability findings.  
See HCRA of Tex., Inc. v. Johnston
, 178 S.W.3d 861, 868, 872 (Tex. App.—Fort Worth 2005, no pet.); 
see also
 
supra
 section III.A.

The standard of review for an excessive damages complaint is factual sufficiency of the evidence.  
See Mar. Overseas Corp.
, 971 S.W.2d at 406; 
Morrell
, 184 S.W.3d at 288 n.33.  An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp.
, 971 S.W.2d at 406-07
.

B.  Parental Consortium Awards

GM next contends that the award of $1,010,000 to each of the girls for loss of parental consortium is excessive in comparison to awards that the supreme court and this court have affirmed in cases in which “the parents were equally if not more disabled and limited in their abilities to interact.”  Thus, GM contends that the awards should be limited to $200,000 for each of the girls.

The Texas Supreme Court does not conduct factual sufficiency reviews.  
See City of Keller
, 168 S.W.3d at 822.  Thus, in the 
Reagan
 case cited by GM, the supreme court did not review the factual sufficiency of the evidence to support the amount of the parental consortium damages awarded but merely the plaintiffs’ entitlement to those damages.  
See Reagan v. Vaughn
, 804 S.W.2d 463, 465-67 (Tex. 1990).  

This court has reviewed the sufficiency of such damages for children in a case in which their father received a head injury as a result of a traffic accident.  
Rendon v. Avance
, 67 S.W.3d 303, 314-16 (Tex. App.—Fort Worth 2001, pet. granted, judgm’t vacated w.r.m.).  But except for the similarity in family relationships and the type of injury sustained, the facts in that case are distinguishable from the facts here.  In 
Rendon
, the children’s father was not their primary caregiver before the accident, and the evidence showed as follows:  

At the time of trial in October 1998, Robert’s condition had improved, and he was able to hold down a position working with people suffering from chronic pain.  His anxiety, debilitating migraine headaches, and depression continue, however, and he will have these problems and need medical care for the rest of his life.  

Id
. at 316.  Thus, 
Rendon
 may be distinguished on its facts.

The factors that the jury may consider in determining the amount of loss of parental consortium damages include, but are not limited to, the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child’s age, the nature of the child’s relationship with the parent, the child’s emotional and physical characteristics, and whether other consortium-giving relationships are available to the child.  
Reagan
, 804 S.W.2d at 467.  The evidence showed that at the time of trial Meghan was eleven and Rachel and Sarah were nine.  Stacey had quit work when Meghan was born and home-schooled the children.  However, Chris and Stacey had discussed putting the girls in school and Stacey going back to work in fall 2003.

Stacey was in a coma for approximately ten weeks.  While Stacey was in the hospital, Chris had to balance visiting her and taking care of the girls, who were “emotionally a wreck.”  At the time, Rachel was in a wheelchair.  Stacey was in a rehabilitation facility until March 2004, over a year after the accident. 

The girls’ therapist, Mary Lee, testified that before the accident, the girls’ “whole lives, other than their dad . . . , was wrapped up in mom.  She was school.  She was mom.  She was discipline. . . . [S]he took them everywhere . . . .  So it was like that they lost, you know, 60 percent of their world almost in that.”  After the accident, “[t]hings were not at all like they were.  Mom came with an entourage.  She came with therapists.  She came with people to help her.  She had round-the-clock help in all areas.  And they could barely have access to mom.” 

At the time of trial, Stacey had improved physically in that she could eat and use the bathroom independently.  But Stacey had trouble seeing, and light bothered her because one of her eyes was dilated.  Her speech was strange.  She could walk, but she had very little flexibility and could lose her balance.  

Stacey’s brain injury caused her to lose the ability to function in an unstructured environment.  Stacey’s rehabilitation therapist stated that things had to be very structured for Stacey, “a little, sort of, narrow world.”  Stacey was impulsive and had unpredictable emotional outbursts, which frightened the children.  When Stacey “ha[d] that impulse to say something negative, hurtful, or even curse, use an expletive, she just sa[id] it.”  Her impulsivity made her “like a kid.”  Stacey did not behave that way before.  The girls could not converse with Stacey and were not comfortable with her and with her voice.  Stacey could not read to the girls anymore, which she used to do every night.  Because Stacey had trouble functioning, and became disturbed in, an unstructured, unpredictable, or noisy environment, such as an environment in which young children are living, and because Stacey needed full-time supervision, Stacey had to move in full-time with her parents, so she no longer lived with Chris and the girls.  The girls visited Stacey, but it was hard for them.

Chris testified that before the accident “Stacey’s relationship with the girls was exceptionally close. . . .  She was the center of their world.  She was their rock.”  He said that all of the girls had a very hard time dealing with Stacey’s injuries and that they wanted their old mom back.  He said they still woke up in the middle of the night crying and wondering why this had to happen and saying that they wanted their mom back.  He said every time they saw Stacey, their hope was renewed, and every time they were reminded that “it’s not mom the way she was before.”

We hold that the evidence detailed above supports the jury’s loss of parental consortium damage findings and that those findings are not excessive.

D.  Damages to Stacey

GM further disputes as excessive the amounts awarded to Stacey for past and future pain and mental anguish ($5 million and $10 million, respectively), future medical care ($6 million), lost earning capacity ($600,000), and future physical impairment ($3.5 million) as excessive.

1. Past and Future Pain and Mental Anguish

GM contends that the award for past physical pain and mental anguish is excessive because “the evidence is clear that however severe [Stacey’s] injuries, she was not and will not be in significant pain, nor has she been or will she be aware of the scope of her injuries.” 

The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss.  
HCRA
, 178 S.W.3d at 871; 
Dollison v. Hayes
, 79 S.W.3d 246, 249 (Tex. App.—Texarkana 2002, no pet.).  The presence or absence of pain, either physical or mental, is an inherently subjective question.  
HCRA
, 178 S.W.3d at 871; 
Dollison
, 79 S.W.3d at 249.  No objective measures exist for analyzing pain and suffering damages.  
HCRA
, 178 S.W.3d at 871; 
see Hicks v. Ricardo
, 834 S.W.2d 587, 591 (Tex. App.—Houston [1st Dist.] 1992, no writ).  Thus, once the existence of some pain and suffering has been established, there is no objective way to measure the adequacy of the amount awarded as compensation.  
HCRA
, 178 S.W.3d at 871; 
Dawson v. Briggs
, 107 S.W.3d 739, 751 (Tex. App.—Fort Worth 2003, no pet.).

A party may establish the existence of conscious pain and suffering by circumstantial evidence.  
HCRA
, 178 S.W.3d at 871; 
Borth v. Charley's Concrete Co
., 139 S.W.3d 391, 395 (Tex. App.—Fort Worth 2004, pet. denied).  Pain and suffering may be inferred or presumed as a consequence of severe injuries.  
HCRA
, 178 S.W.3d at 871; 
Borth
, 139 S.W.3d at 395.  The duration of the pain and mental anguish is an important consideration.  
HCRA
, 178 S.W.3d at 871; 
SunBridge Healthcare Corp. v. Penny
, 160 S.W.3d 230, 250 (Tex. App.—Texarkana 2005, no pet.).  The jury is given a great deal of discretion in awarding an amount of damages it deems appropriate for pain and suffering.  
HCRA
, 178 S.W.3d at 871; 
Dollison
, 79 S.W.3d at 249.   Despite this broad discretion, there must “be some evidence to justify the amount awarded,” as a jury “cannot simply pick a number and put it in the blank.”  
Saenz v. Fid. & Guar. Ins. Underwriters
, 925 S.W.2d 607, 614 (Tex. 1996).

As long as sufficient probative evidence exists to support the jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment for that of the jury.  
Larson v. Cactus Util. Co.
, 730 S.W.2d 640, 641 (Tex. 1987); 
HCRA
, 178 S.W.3d at 871.  A verdict will be set aside on appeal only where the record clearly indicates that the award was based on passion, prejudice, or improper motive, or is so excessive as to shock the conscience.  
HCRA
, 178 S.W.3d at 871-72; 
Transit Mgmt. Co. of Laredo v. Sanchez
, 886 S.W.2d 823, 826 (Tex. App.—San Antonio 1994, no writ).

There must also be evidence that the amount of mental anguish damages awarded is fair and reasonable, and the appellate court must perform a “meaningful evidentiary review” of the amount found.  
Saenz
, 925 S.W.2d at 614.

GM contends that the evidence is factually insufficient to support the jury’s damage findings on pain and mental anguish because the evidence shows that Stacey “was not and will not be in significant pain, nor has she been or will she be aware of the scope of her injuries.”  The evidence shows that when Stacey was first out of the hospital and in a rehabilitation facility, “[h]er feet had been damaged and atrophied, as well as her arm.”  She had to have intensive therapy.  By the time of trial, although Stacey could walk without assistance, her rehabilitation therapist testified that Stacey had an abnormal gait and weakness on her right side.  She also had stiffness on the right side of her body.  The therapist also stated that Stacey had suffered depression and emotional outbursts. 

Jim Reid, Stacey’s father, also testified that one of Stacey’s eyes was extremely dilated as a result of her brain injury and that she was extremely sensitive to light.  He stated that Stacey had very little flexibility and walked “ramrod straight” as if she was “fused.”  If Stacey bent over, she tended to lose her balance.  Because Stacey did not get some of the therapy she needed while she was in a coma, she had to have an operation on both of her achilles heels. 

Jim discussed the stress Stacey was under when she first moved home with Chris and the girls.  According to Jim, “the fact that Stacey was able to recognize where she was now versus where she was before, put an incredible amount of stress on Stacey.  And we saw her begin to lapse back and not be able to progress.”  Jim testified that one of the “most devastating” things for Stacey was that “she knows where she was, and it’s very frustrating . . . and [i]t provokes sometimes anger.”  When this happened, Stacey knew what she was doing, but she could not stop herself.  She cursed in front of the girls.  Stacey’s father testified that “Stacey does not have the mind that she once had, and she knows it.”  Chris testified that Stacey sometimes asked him, “When is the nightmare going to end?  When am I going to wake up and everything is going to be okay?” 

We hold that probative evidence in the record supports the jury’s damage findings as to Stacey’s past and future pain and mental anguish.

2. Future Medical Care
 

GM contends that there is no basis of the jury’s award of $6 million for future medical care because appellees presented no evidence of present value.  But appellees were not required to introduce such evidence because the jury was qualified to make the calculation based on its common knowledge of interest rates.  
See Rendon
, 67 S.W.3d at 310.  Here, the trial court instructed the jury to calculate all of the damage awards as a sum “if paid now in cash.”  We must presume that the jury followed the trial court’s instructions.  
See id
.  Although appellees’ medical expense expert testified that he had not attempted to discount his estimate of $6 million to present value, he also testified that his estimate was a conservative figure that could be up to $9 million and that it did not include any increases for rising medical costs.  Thus, the jury could have determined that the total future medical damages that Stacey would incur were greater than $6 million and that the present value discount was offset by the rising future costs.

3. Lost Earning Capacity

GM also argues that the jury’s award of $600,000 for loss of future earning capacity is insupportable because appellees’ life care plan expert, Dr. Carl Hansen, “offered only speculation based on [Stacey’s] out-of-date employment history.”  Although Stacey had a master’s degree in public analysis and political science and had worked as a researcher and account representative for Congressional Quarterly, at the time of the accident she had not worked in almost ten years because she had not returned to work after having children.  However, Stacey and her husband had planned for her to return to work in late 2003. 

Lost earning capacity is not measured by what a person actually earned before an injury but by what the person’s capacity to earn a livelihood actually was even if he or she had never worked in that capacity in the past.  
Pilgrim’s Pride Corp. v. Smoak
, 134 S.W.3d 880, 900 (Tex. App.—Texarkana 2004, pet. denied).  In order to recover diminished earning capacity in a particular occupation, it is not always necessary for the plaintiff to have been working in and deriving earnings from that occupation before injury, as long as earnings from that occupation would provide a true measure of that plaintiff’s earning capacity.  
Id
.  At least one Texas court has upheld an award for lost earning capacity when the only evidence of the plaintiff’s earnings was from twenty years before the accident.  
See El Paso Elec. Ry. Co. v. Murphy
, 109 S.W. 489, 490 (Tex. Civ. App. 1908, writ ref’d) (“It must be observed that the matter to be determined is not what he actually earned before his injury, but what his earning capacity actually was, and to what extent that capacity has been impaired.  For whatever capacity he had for earning money before the injury, whether he exercised it or not, was his, and he was entitled to it unimpaired by injury wrongfully inflicted by another.”).

Dr. Hansen testified by deposition.  He performed a vocational evaluation of Stacey.  In doing so, he interviewed Stacey and reviewed, among other things, Stacey’s medical reports and her W-2 statements for 1993 and 1994.  Dr. Hansen also 

did types of research that were disability and labor market oriented, and those research items deal with traumatic brain injuries, occupational information pertaining to the type of work history [Stacey] had, and wage data specific to the Dallas area in types of jobs that she at one time would have been suitably employed in.

Dr. Hansen testified that Stacey’s 
skills
 before the accident would have enabled her to work as a communications editor, regulatory affairs analyst, speech writer, management analyst, and meeting and convention planner.  Dr. Hansen estimated that those jobs would have a value of $58,000 per year.  Dr. Hansen specifically stated that this amount was less than what Stacey would have been earning previously “because she’s been out of the labor market for a number of years and wouldn’t have started [at] as . . . high [a] salary as what she had years ago.”  Thus, Dr. Hansen not only took into account Stacey’s past work history and skills, he also expressly adjusted his determination of her earning capacity based on the fact that she had been out of the workforce for some time.  Thus, Dr. Hansen’s testimony about Stacey’s future earning capacity was not speculative based on the almost ten-year gap in her employment history—a commonplace occurrence for women in their childbearing years.

4. Future Physical Impairment

Finally, GM contends that the evidence is factually insufficient to support the $3.5 million award for future physical impairment in addition to the awards for future pain and mental anguish and future lost earning capacity.  GM asks us to reduce the award to $1 million.  GM relies on the supreme court’s opinion in 
Golden Eagle Archery, Inc. v. Jackson
 for the proposition that “because awards for future physical impairment can lead to double recovery, trial courts must instruct the jury” as follows:  “that the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity and that a claimant should not be compensated more than once for the same elements of loss or injury.”  116 S.W.3d 757, 772 (Tex. 2003). 

Here, the trial court instructed the jury to

[c]onsider the elements of damages listed below and none other.  Consider each element separately.  
In answering this question you shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss, that is, do not compensate twice for the same loss.  
[Emphasis added.]

This instruction substantially comports with the mandate of the supreme court in 
Golden Eagle.
 

Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party’s former lifestyle.  
Dawson
, 107 S.W.3d at 752; 
Schindler Elevator Corp. v. Anderson
, 78 S.W.3d 392, 412 (Tex. App.—Houston [14th Dist.] 2001, pet. dism’d by agr.).  Physical impairment is an element of damages that extends beyond loss of earning capacity and beyond any pain and suffering, to the extent that it produces a separate loss that is substantial or extremely disabling.  
Dawson
, 107 S.W.3d at 752.   To recover damages for physical impairment, the plaintiff must show that (1) he or she incurred injuries that are distinct from, or extend beyond, injuries compensable as pain and suffering, loss of earning capacity, or other damage elements and (2) these distinct injuries have had a “substantial” effect.  
Tagle v. Galvan
, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.); 
Patlyek v. Brittain
, 149 S.W.3d 781, 785 (Tex. App.—Austin 2004, pet. denied); 
Dawson
, 107 S.W.3d at 752.  If other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life.  
Golden Eagle
, 116 S.W.3d at 772.

In reviewing the factual sufficiency of a damage award, we must presume that the jury followed the trial court’s instructions unless the record demonstrates otherwise.  
Id
. at 771.  In performing such a review, we must consider all the evidence that bears on the challenged category of damages, even if the evidence also relates to another category of damages.  
Id
. at 773.  To do otherwise would mean that evidence that reasonably could have supported the jury’s award would not be considered, which would be improper.  
Id
.  If more than one award in overlapping categories is challenged as excessive, we must consider all the evidence that relates to the total amount awarded in all overlapping categories to determine if the total amount awarded was excessive.  
Id
. at 773-74.  This likewise gives full effect to all the evidence without crediting any of the evidence more than once.  
Id
. at 774.

Thus, we have also reviewed the evidence to determine whether, when combined, the jury’s awards for past and future pain and suffering and mental anguish, loss of future earning capacity, and future physical impairment (a total of $19.1 million) are excessive.  GM contends that the future physical impairment award should be reduced because Stacey is “independent in all the activities of daily living” and does not require supervision because of physical limitations. 

But the evidence at trial showed that Stacey continued to suffer from physical limitations such as blurred vision, light sensitivity, abnormal voice tenor, loss of flexibility and balance, weakness on the right side of her body, and spasticity.  As a result of these problems in addition to her mental impairments, she could not read to her children, drive a car, or live without supervision.  As one of appellees’ experts stated, “Every aspect of her experience in the world has been altered as a result of this injury to the brain.”  All of appellees’ experts agreed that Stacey had reached maximum improvement and would continue to have these problems and more throughout the rest of her life.  Based on the record evidence and the applicable standard of review, we hold that the jury’s award for future physical impairment was not excessive.

We overrule the remainder of GM’s fifth issue.

VII.  Conclusion

Having overruled GM’s first through fourth issues and overruled in part and sustained in part its fifth issue, we modify the trial court’s judgment to delete the award of bystander damages of $7.5 million to Chris as next friend for Rachel, Sarah, and Meghan.  In all other respects, we affirm the trial court’s judgment as modified.

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED: September 21, 2006

FOOTNOTES
1:
Carol, the other defendant, is Stacey’s mother and has not appealed the judgment.

2:
The parties do not dispute that Stacey’s head hit the B-pillar.  They do, however, dispute whether hitting the B-pillar was the primary cause of Stacey’s injuries.

3:
The Suburban is designed around a CK truck frame.

4:
NHTSA conducts safety tests and promulgates federal safety regulations for automobile manufacturers.  
Gen. Motors Corp. v. Harper
, 61 S.W.3d 118, 124 (Tex. App.—Eastland 2001, pet. denied)
.

5:
There is nothing in the record regarding any subsequent changes to the standards.

6:
Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 5.02, 2003 Tex. Gen. Laws 847, 861-62, 899.

7:
Lorenz
 states this proposition in the context of analyzing the propriety of a jury instruction and 
Sims
 in a factual sufficiency review of the evidence on design defect.  
Lorenz
, 896 F.2d at 150-51; 
Sims
, 932 S.W.2d at 565. 

8:
Dr. Perl determined that the Suburban was traveling at about eleven miles per hour when the eighteen-wheeler hit it. 

9:
The sensors that determined whether to deploy the airbags were accelerometer based, meaning that they sensed and deployed based on changes in velocity. 

10:
The record also shows that Mahon stated, “But then the thing that is to me disturbing is provides societal benefit.”  Although this statement is somewhat unclear—and we cannot determine whether it represents Mahon’s words verbatim or if there has been an omission from the sentence as transcribed—it appears from the context of this statement that Mahon is speaking to the benefit of weighing the small risk of inflation-induced injury in light of a larger risk of injury to an occupant in a severe side impact in which the airbag does not deploy.

11:
GM focuses heavily on its own evidence of its high standards for prevention of inflation-induced injury risk.  But we believe that the jury was entitled to weigh the two concerns involved—inflation-induced injury and occupant protection—and determine whether GM unreasonably placed reduction of a slight inflation-induced injury risk ahead of occupant protection as a goal.

12:
GM does not challenge the third element on appeal. 

13:
GM contends that Caldwell’s analysis is no evidence of when Stacey’s shoulder impacted the B-pillar; therefore, there is no evidence that the airbag would have been able to deploy if her shoulder was too close.  But appellees’ experts also testified about the safer alternative design of a side airbag that provides head protection without deploying between the shoulder and the vehicle interior.

14:
GM also claims that there is no evidence that deployment of a head protection airbag in these circumstances would not impose a greater risk to others.  Although we disagree based on the evidence we have reviewed, we note that this contention is not crucial to our analysis because we have already determined that the evidence supports appellees’ assertion that the addition of a second sensor in the B-pillar would have caused the airbag to deploy, preventing Stacey’s brain injury, without increasing the risk to others.

15:
Friedman also testified that the Suburban was defective because it did not have enough padding on the B-pillar.  GM contends that there is no evidence to support this theory, but we need not address this contention because we have determined that the evidence is legally sufficient to prove that the Suburban was defective by failing to include a second sensor governing deployment of the airbag.  
See
 
Tex. R. App. P.
 47.1; 
Raman Chandler Props., L.C. v. Caldwell’s Creek Homeowners Ass’n, Inc.
, 178 S.W.3d 384, 396 (Tex. App.—Fort Worth 2005, pet. denied).

16:
The occipital condyle is located at the base of the skull where the skull meets the spinal cord opening.  

17:
The C-pillar is part of the truck frame similar to the B-pillar but located next to the middle seat passenger side of the truck.

18:
GM claims that Chris “embraced” the girls when they were introduced, but this is not shown in the record. 

19:
See Gen. Motors Corp. v. Iracheta
, 161 S.W.3d 462, 472 (Tex. 2005), cited by GM, in which the Texas Supreme Court held that the trial court’s unobjected-to error in allowing the grandmother of the deceased plaintiffs to personally thank the all-Hispanic jury in Spanish was harmful.

20:
Contrary to GM’s contentions, the introduction that occurred here is distinguishable from the grandmother’s comments in 
Iracheta
.  In that case, the grandmother of the deceased plaintiffs 
personally thanked
 the all-Hispanic jury in Spanish on behalf of the deceased plaintiffs. 
 Iracheta
, 161 S.W.3d at 472.  Here, neither Chris nor the girls thanked the jury, nor can we determine from the record that they made any personal overtures to the jury on behalf of Stacey or themselves.  Moreover, we fail to see how the mere introduction of the girls to the jury is that much more harmful than the introduction into evidence of several photographs of Chris, Stacey, and the girls, which GM does not complain about on appeal.

21:
Appellees did not dispute at trial that Carol caused the accident, but they did dispute that all of Stacey’s injuries were caused by Carol’s actions; specifically, they contended that had the airbag timely deployed, Stacey would have suffered no injuries, or much more minor injuries.

22:
Indeed, we fail to see why such additional detail is necessary given that the jury heard repeatedly that in the course of violating traffic laws, Carol turned directly into the path of an eighteen-wheeler traveling over forty miles per hour.

23:
To be admissible on the issue of design defect, evidence of other events must be reasonably similar to the event in which the plaintiff was injured.  
See Nissan Motor Co. v. Armstrong
, 145 S.W.3d 131, 138-39 (Tex. 2004); 
Martinez
, 977 S.W.2d at 340-41.

24:
He did not say which little girl was crying, but the evidence shows that Rachel, who suffered a broken leg in the accident, was still sitting in the back seat and did not get out of the Suburban immediately after the accident like the other two girls.