

# NUMBER 13-13-00481-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

SYLVIA ROGER, INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF JEAN LOUIS ROGER, SR.,
ET AL.,                                                      Appellants,

v.

BENJAMIN KARL MUMME, JR. AND
CAMERON INTERNATIONAL CORPORATION,          Appellees.

## On appeal from the 319th District Court
## of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Perkes
### Memorandum Opinion by Chief Justice Valdez

Appellants, Sylvia Roger, individually and as personal representative of the estate of Jean Louis Roger Sr., Ashley Roger, Jean Roger Jr., and John Roger, brought suit against appellees, Benjamin Karl Mumme Jr. and Cameron International Corporation, under the Texas Wrongful Death Act for the death of Jean Roger Sr. *See* TEX. CIV. PRAC.

& REM. CODE ANN § 71.004(a) (West, Westlaw through 2015 R.S.). After a jury trial, the jury awarded compensatory damages to Sylvia Roger, Jean Roger Jr., and John Roger in the amount of $1,305,628.50. By two issues, appellants contend: (1) the trial court abused its discretion during jury selection by erroneously granting two challenges for cause and denying a third; and (2) the trial court erred in directing a verdict against Jean Roger Sr.'s daughter, Ashley Roger, on the basis that she does not qualify as a "child" under the Texas Wrongful Death Act. We reverse in part and affirm in part.

## I. BACKGROUND

On March 5, 2012, Jean Louis Roger Sr. (Jean) suffered fatal injuries from a vehicle accident in Corpus Christi, Texas when a commercial truck, driven by Mumme, ran a red light and collided with his car. Jean was survived by his wife, Sylvia Roger, and his three children—Jean Roger Jr., John Roger, and Ashley Roger (Ashley). These surviving members of the Roger family sued appellees, seeking damages under the Texas Wrongful Death Act. After attempts to settle the case failed, the case was called for a jury trial.

During voir dire, over appellants' objections, the trial court struck veniremembers fifteen and seventeen for cause, but did not strike veniremember twenty-six. Thereafter, a jury was empaneled and the case proceeded to trial. At the close of the evidence, the trial court submitted the claims of Sylvia Roger, Jean Roger Jr., and John Roger to the jury. However, the trial court directed a verdict against Ashley. This appeal followed.

## II. JURY SELECTION

By their first issue, appellants contend that the trial court erred when it struck veniremembers fifteen and seventeen for cause but did not strike veniremember twenty-six. Specifically, appellants argue that veniremembers fifteen and seventeen were

2

improperly struck for cause when "neither one of them remotely suffered from any disqualifying bias," while veniremember twenty-six should have been stuck for cause on account of his bias against "large damage awards in general and recoveries of mental anguish and pain and suffering in particular." Appellants argue that these three allegedly erroneous rulings revealed an impermissible double-standard for determining who sat on the jury, which ultimately resulted in a low-dollar verdict.

## A. STANDARD OF REVIEW

During jury selection, the parties may raise challenges for cause to disqualify veniremembers from serving on the jury. *See* TEX. R. CIV. P. 228, 229. A veniremember is disqualified to serve as a juror on a particular case if he or she has a bias or prejudice in favor of or against a party. *See* TEX. GOV'T CODE ANN. § 62.105(4) (West, Westlaw through 2015 R.S.). "[B]ias and prejudice form a trait common in all persons; however, to fall within the disqualifying provision of [section 62.105] certain degrees thereof must exist." *Gant v. Dumas Glass & Mirror, Inc.*, 935 S.W.2d 202, 207 (Tex. App.—Amarillo 1996, no writ) (citing *Compton v. Henrie*, 364 S.W.2d 179, 181–82 (Tex. 1963)). As such, the Texas Supreme Court has defined bias as "an inclination toward one side of an issue rather than the other, but to disqualify, it must appear that the state of mind of the juror leads to the natural inference that he [or she] will not or did not act with impartiality." *Goode v. Shoukfeh*, 943 S.W.2d 441, 453 (Tex. 1997) (citing *Compton,* 364 S.W.2d at 182). Prejudice, which disqualifies a veniremember, means prejudgment and embraces bias. *Id.* This disqualification extends to bias or prejudice against the subject matter of the suit as well as against the parties to the suit. *Id.* Thus, "the key response that supports a successful challenge for cause is that the veniremember cannot be fair and impartial, because the veniremember's feelings are so strong in favor of or against a party or against

3

the subject matter of the litigation that the veniremember's verdict will be based upon those feelings and not on the evidence." *Gant*, 935 S.W.2d at 208.

Bias, prejudice, or inability to follow the trial court's instructions "may not be discernible from a single statement or response to a general question." *Murff v. Pass*, 249 S.W.3d 407, 411 (Tex. 2008). A veniremember may appear biased as a result of inappropriate leading questions, confusion, misunderstanding, ignorance of the law, or merely "loose words spoken in warm debate." *Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 92 (Tex. 2005). In such situations, a veniremember may be "rehabilitated" through further questioning by counsel to show that he or she is not biased. *Id.* However, if the record clearly shows that a veniremember is materially biased, his or her recantation of that bias at the prodding of counsel will normally be insufficient to prevent disqualification of the veniremember. *Id.* To demonstrate a disqualifying bias, veniremembers are sometimes asked which party they think is starting out "ahead" in the case. *Id.* at 96. A veniremember's statement that one party is ahead may support grounds for disqualification when the statement is made before any evidence or information about the case has been disclosed. *Id.*

If a veniremember is biased or prejudiced as a matter of law, the trial court must disqualify that person from service on the jury. *Malone v. Foster*, 977 S.W.2d 562, 564 (Tex. 1998). If, on the other hand, a veniremember is not biased or prejudiced as a matter of law, then the trial judge must make a difficult factual determination as to whether the member is nevertheless sufficiently biased or prejudiced to merit disqualification. *Id.* Because trial judges are present in the courtroom and are in the best position to evaluate the sincerity and attitude of individual veniremembers, they are given "wide latitude in both conducting voir dire proceedings, [and] in determining whether a [venire]member is

4

impermissibly partial [.]" *Murff*, 249 S.W.3d at 411. Thus, we must consider the entire examination in the light most favorable to the trial court's ruling, reversing only for an abuse of discretion. *Id.* A trial court abuses its discretion in refusing to disqualify a veniremember for cause if the record shows that the veniremember was not able or willing to set aside personal beliefs to act impartially. *Jordan v. Sava, Inc.*, 222 S.W.3d 840, 845 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

**B. ANALYSIS**

**1. Veniremember Fifteen**

The trial court granted appellees' challenge for cause against veniremember fifteen based on the sympathy that he expressed for appellants. Jurors may not deliver a verdict based in any part upon sympathy. *See* TEX. R. CIV. P. 226a, § III (requiring the following jury instruction: "Do not let bias, prejudice or *sympathy* play any part in your decision.") (emphasis added). Appellants contend that veniremember fifteen did not suffer from a disqualifying bias because he was merely equivocal about his feelings of sympathy and reassured the trial court that he could follow the law. Concerning veniremember fifteen, he initially pledged his commitment to follow the law despite his personal sympathies for appellants:

> Q. And with regards to sympathy . . . you would be able to set aside the sympathy side of it and weigh the evidence and listen to the evidence that I [appellants' counsel] put on about my client's harms and losses?
>
> A. Right.
>
> Q. And not factor in sympathy but just weigh your verdict on the evidence?
>
> A. (Nods head.)
>
> Q. You believe you could do that?

5

A.  Right.

Q.  Okay. And that's the—you have a firm belief of that right now, right?

A.  Right.

Q.  And despite any questions that might be asked of you later on, you will be able to follow the Court's instructions and follow the law and listen to the evidence and not let sympathy weigh in on your verdict?

A.  All right.

Q.  Correct.

A.  (Nods head.)

However, the record reflects that after veniremember fifteen pledged his commitment to set sympathies aside and follow the law, he admitted during appellees' voir dire examination that sympathy would affect his ability to fairly and impartially judge the facts of the case:

Q.  [Y]ou said [that] you had had a lot of sympathy for [appellants]; is that correct?

A.  Correct.

Q.  You understand the loss that they've suffered, right?

A.  Right.

Q.  You understand that [Jean] was in the hospital for five days before he passed?

A.  Right.

Q.  Do you think that hearing that sort of evidence would draw on the sympathy that you already feel for the [appellants]?

A.  That's hard.  Yeah.

Q.  Do you think those sort of facts would magnify the sympathy that you feel for the [appellants]?

A.  Yeah, I—yeah, I think so.

6

Q. Do you think that that sympathy might be magnified to such an extent that you couldn't fair[ly] and impartially judge the facts that you hear in this case?

A. I would—that's really hard, so it kind of would be. I'm trying to—trying to still be impartial to both sides. But yeah, when you think about it a little bit more, that's—yeah.

Moreover, later in his voir dire examination, veniremember fifteen confirmed that appellants were "already ahead" of appellees and that this would affect his verdict. Specifically, he admitted that appellants' head-start would affect his ability to "get there" (to a true result) after the presentation of evidence:

Q. You want to do the right thing?

A. Right.

Q. But what you're thinking is that maybe I can't get there, maybe [appellants are] already ahead of [appellees]. Is that correct?

A. Okay. Yeah, I believe so.[1]

In *Cortez*, the Texas Supreme Court observed that "veniremembers may be disqualified even if they say they can be 'fair and impartial,' so long as the rest of the record shows they cannot." *Cortez ex rel. Estate of Puentes*, 159 S.W.3d at 93. In view

---

[1] Citing *Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.*, appellants argue that the veniremember's statement that appellants were "already ahead" did not indicate a disqualifying bias. *See* 159 S.W.3d 87, 94 (Tex. 2005). We disagree. In *Cortez*, the Texas Supreme Court held that a veniremember's "leaning" statement that one party is ahead does not constitute disqualifying bias if the statement merely indicates an opinion about the evidence. *See id.* In that case, the challenged veniremember was in a position to express an opinion about the evidence because counsel had already given "an extended and emotional opening statement summarizing the facts of the case to the venire." *Id.* According to the Court, the veniremember's statement that one party "would be starting out ahead" of the other party was merely a comment on the evidence—evidence which counsel had previewed to the venire during his extended and emotional opening statement. *Id.* Thus, the Court found the statement to be more of a preview of a veniremember's likely vote than an expression of an actual bias. *Id.* Here, by contrast, veniremember fifteen had heard only a brief allusion to the damages dispute. His statement could not represent the kind of "opinion about the evidence" or "preview of a veniremember's likely vote" that was involved in *Cortez.* Therefore, we cannot agree with appellants that the veniremember's leaning statement did not indicate a disqualifying bias. In any event, the veniremember's statement was not the only evidence bearing on his bias because he admitted that sympathy would affect his ability to fairly and impartially judge the facts of the case. Consequently, even without considering the veniremember's leaning statement, the trial court had other evidence to find disqualifying bias.

7

of the entire voir dire examination, this observation rings true here—where the veniremember followed up his initial pledge of fairness and impartiality with affirmations that appellants were "already ahead" of appellees and that he could not set sympathies aside. Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court did not abuse its discretion in finding that veniremember fifteen could not act with impartiality. *See id.* at 95.

## 2. Veniremember Seventeen

The trial court also granted appellees' challenge for cause against veniremember seventeen based on the sympathy that he expressed for appellants. Appellants argue that veniremember seventeen did not suffer from a disqualifying bias because, although he "initially equivocated on whether he would be able to set sympathetic feelings aside, he ultimately stated unequivocally that he could do so and would decide this case based on the evidence, the law and the [trial court's] instructions."

During the appellants' initial voir dire, veniremember seventeen stated that feelings of sympathy would probably affect his ability to be a fair juror. Appellants then attempted to rehabilitate veniremember seventeen by eliciting the following responses:

> Q.    [D]o you believe you could weigh the evidence fairly for both sides in this case? Do you not?
>
> A.    I'm not sure.
>
> Q.    Okay. Tell me why it is you're not sure.
>
> A.    I'm a very sympathetic person, a very sensitive person.
>
> Q.    Okay. And—
>
> A.    I have a lot of feelings, yeah.
>
> . . . .

8

Q.    But . . . even having those feelings . . . do you believe you could listen to the evidence and hear all the evidence and then just render or make your judgment based on just—on the evidence?

A.    Probably so, yes.

However, after appellants attempted to rehabilitate veniremember seventeen, he later admitted that there was a "strong chance" that his feelings of sympathy and sensitivity would prevent him from following the trial court's instructions. We cannot agree with appellants that veniremember seventeen "unequivocally" stated that he could decide the case based on the evidence and not on sympathy when he stated that there was a "strong chance" he would not be able to do so. The judge had the benefit of observing firsthand the demeanor of veniremember seventeen in making the factual determination as to whether he was sufficiently biased to merit disqualification. *See Gen. Motors Corp. v. Burry,* 203 S.W.3d 514, 547 (Tex. App.—Fort Worth 2006, pet. denied) (observing that "[b]ecause we were not in a position to observe veniremember seventeen as the trial court was, we know nothing about her demeanor, expressions, tone, or vocal inflection" when she stated that she did not think she would be able to set her sympathies aside). Viewing the entire examination in the light most favorable to the trial court's ruling, we cannot conclude that the trial court abused its discretion in finding that veniremember seventeen could not act with impartiality. *See Cortez,* 159 S.W.3d at 94.

### 3. Veniremember Twenty-six

During voir dire examination, veniremember twenty-six caught the attention of the parties because of his views about lawsuit abuse, damage amounts, and his membership in "Bay Area Citizens Against Lawsuit Abuse" (BACLA). The trial court overruled appellants' challenge for cause against veniremember twenty-six. When, as here, the trial court overrules a challenge for cause, there is "an implied finding that bias or

9

prejudice does not exist such that it constitutes disqualification." *Gant*, 935 S.W.2d at 207. Appellants challenge the trial court's implied finding, arguing that veniremember twenty-six was disqualified as a matter of law because he "repeatedly (and candidly) admitted that he was biased and prejudiced" against appellants on a pivotal issue in the case—damages. In support of their position, appellants point to the following voir dire examination, which appellants contend demonstrated his bias "against large damage awards in general and recoveries of mental anguish and suffering in particular":

Q. You also answered that you believe that there should be upper limits with regards to jury verdicts. Do you recall that?

A. Right. Yes.

Q. Okay. And what do you mean? Explain that to me.

A. Well, if you have—certainly you have damages, okay? For instance, a husband dies. He was going to put those kids through college, and he was going to—all of that is fair game, you know. But then you get into pain and suffering. Well, how much is reasonable, $100,000, $10 million, $500 million? You get into excessive requests. And so that's what. . .

Q. And you believe that they're, in your opinion—

A. That there should be limits to that.

Q. All right.

A. Because—because in my mind what people don't understand is money doesn't come out of thin air. You're taking money away from somebody else, right? Somebody had to earn that money, somebody is going to pay higher insurance costs. Maybe a business can't start up because he can't afford the insurance. Maybe a company won't give raises, won't hire ten people. There are real consequences to settlements. Money does not appear out of thin air. You're taking it from one person and giving to another. And so it has to be fair and balanced. Just like we talked about the law being fair and balanced.

Q. Okay. And that goes along with you said settlement, but that goes along with your ability to render at least a verdict with regards to the

10

type of things you're talking about?  The mental anguish or the pain and suffering?

A.     Right.

Q.     And the fact that that money doesn't make the pain and suffering go away, there are situations where that's just inappropriate?

A.     Right.

Q.     Okay.

A.     I mean, you can compensate for some things.  You can make an attempt to help out some.  But it wouldn't matter if you gave them Fort Knox.

Q.     Okay.

A.     You know, the loss is there.  You can't make up for that loss.

Q.     And despite whatever evidence I put on with regards to those types of losses, that's how you feel?

A.     Right.

Q.     Okay.  And nothing is going to change your mind on that?

A.     No.  I mean, I feel like I could hear evidence, and I'm as sympathetic—or empathetic as anybody else.  I have six you [sic] children, you know.  I've lost family members in automobile accidents, you know.  But . . .

Q.     And that I appreciate.  And I'm focusing on just the fact with regards to your association with BACLA and your feelings with respect to limits on those—you know, the—we call the intangible, the non-economic damages such as pain and suffering or mental anguish.  You absolutely believe that there should be caps on that—

A.     Yes, I do.

Q.     —based on all the feelings you talk about?

A.     Yes, I do.

Q.     You know, because it comes from somewhere.  And you can't replace the pain. So therefore, no matter what evidence I put on with regards to their harms and losses, that's still how you feel?

11

A.     That's how I feel.

Appellants assert that veniremember twenty-six revealed an "unshakeable conviction" regarding the nature and amount of damages appropriately recoverable in a wrongful death case and merited disqualification. Viewing the examination quoted above in isolation, it is definitely arguable that veniremember twenty-six appeared to have a disqualifying bias on the issue of damages. However, our standard of review directs that we must view not only the isolated section quoted above, but his *entire* voir dire examination to determine whether the trial court abused its discretion in not disqualifying him. *See Murff*, 249 S.W.3d at 411. In *Cortez*, the Court held that a veniremember who expresses an initial apparent bias may be rehabilitated through further questioning to demonstrate that the member is not in fact biased. *Cortez ex rel. Estate of Puentes*, 159 S.W.3d at 91. Here, through further questioning by appellees' counsel, veniremember twenty-six was allowed to clarify what, at first blush, may have seemed like disqualifying bias:

Q.     All right. As a juror, your responsibility as a juror would be to weigh the evidence in the case fairly and make a decision based on the evidence in this case. Now, I understand you have feelings about, you know, lawsuit abuse.

A.     Right.

Q.     And nobody is making a claim of lawsuit abuse here. You have feelings about mental anguish damages. This is a case of mental anguish.

A.     Right.

. . . .

Q.     So now the question is this, can you be a fair and impartial juror in this case based on the evidence in this case?

A.     Yes, I feel like I could.

12

Q.      And if there is a blank, if the Court were to give you an instruction, a blank to award damages, for whatever whether it be pain and suffering or past medical expenses or whatever, and the plaintiffs have presented evidence that supports damages, would you as a juror be able and willing to deliberate with the other 11 jurors about what to—how to answer that question?  That's really all we're asking here.

A.      Yes.  I mean, I would do that.  I'm an engineer.  I mean, engineers look at all the facts and evidence and make decisions every day. That's what we do.

Q.      You're not pre-com[m]itted to any particular decision in this case, are you, sir?

A.      No.

Q.      And you've not pre-judged anybody in this case?

A.      No, I have not.

Q.      And you feel like you can weigh the evidence and be fair in this case? Is that what I'm hearing?

A.      Yes.  Yes, I could

Thus, veniremember twenty-six clarified that he was "not pre-committed to any particular decision in this case," that he had "not pre-judged anybody in this case," and that he could "weigh the evidence and be fair."  Citing *Cortez*, however, appellants argue that the veniremember's responses were ineffective to remove a disqualifying bias that he initially expressed because his responses were made at the "prodding" of appellees' counsel. *See id.* at 92. (observing that "if the record, taken as a whole, clearly shows that a veniremember was materially biased, his or her ultimate recantation of that bias *at the prodding of counsel* will normally be insufficient to prevent the veniremember's disqualification") (emphasis added).  We disagree.  The record reflects that after appellees' counsel allegedly "prodded," veniremember twenty-six maintained that he

could follow the law and the evidence—even in response to subsequent leading questioning by appellants' counsel:

> Q. With respect to those extrinsic items you talked about; increase in insurance; you know, the failure for a company to be able to hire individuals, things of that nature, those extrinsic issues you would not be able to set aside in your deliberations in this case, correct?
>
> A. You follow the law, not your opinion. I have opinions on things, that's my opinion.
>
> . . . .
>
> A. If I was given instruction: Here's the law, here's the evidence. You follow the law and the evidence. You don't—as a juror I'm not making up law. I'm not—you know, I'm following law and evidence.
>
> . . . .
>
> A. I mean, we're talking theoretical here, and so I would listen and see what the law applied and stuff. But, I mean, I don't want to be dishonest in any way, I do have a problem with enormous settlements. I mean, you can destroy a company, you can destroy a lot of other lives.
>
> . . . .
>
> A. I mean, I would look at the—the whole picture.
>
> . . . .
>
> A. You know, and say what's fair. I mean, if you're asking the jury to decide what's fair, I would try to look at the whole picture as to what was fair.[2]

---

[2] In their reply brief, appellants note that not all of the veniremember's responses during this last exchange demonstrated that he could follow the law and the evidence. For example, appellants highlight the veniremember's affirmative response to the following question: "Despite what the law says, you have a predisposition with regards to limits on what you believe would be appropriate and for things like we talked about, mental anguish and pain and suffering, correct?" It is true that not all of the veniremember's responses were consistent during this last exchange. But it is also true that all of appellants' questions to the veniremember were leading in nature and phrased so as to elicit a specific response. Despite the leading nature of appellants' questioning, the majority of the veniremember's responses were consistent on the issue of whether he could follow the law and the evidence. And to the extent that the veniremember was inconsistent during this last exchange, the trial court was in the best position to evaluate his credibility

As the Texas Supreme Court stated in *Cortez*, the veniremember's willingness to try to make his decision based upon the evidence and the law is "all we can ask of [him]."[3] *See id.* at 93 (observing that a trial court has discretion to refuse to disqualify a veniremember who indicates a "willing[ness] to try to make his decision based on the evidence and the law" even if he initially expresses an apparent bias); *see also Powers v. Palacios*, 794 S.W.2d 493, 495 (Tex. App.—Corpus Christi 1990, writ granted) (holding that the trial court did not abuse its discretion in refusing to strike three veniremembers who stated that they would have difficulty awarding damages when all three later stated that they could hear the evidence presented and be fair and impartial), *rev'd on other grounds*, 813 S.W.2d 489 (Tex. 1991); *Jones v. Lakshmikanth*, No. 13-03-662-CV, 2005 WL 2036739, at *4 (Tex. App.—Corpus Christi Aug. 25, 2005, no pet.) (mem. op.) (holding that an "expression of generic discontent with malpractice cases" was not disqualifying when the veniremember "twice responded that she could be fair" and promised that "she could be fair to both sides and judge the evidence fairly"); *Oliver v. Long Island Owners Ass'n, Inc.*, 13-08-00385-CV, 2009 WL 1740828, at *4 (Tex. App.—Corpus Christi June 11, 2009, pet. denied) (mem. op.) (holding that the trial court did not abuse its discretion in refusing to strike two veniremembers who initially stated that they could not award ten million dollars in damages even with proof when, after further questioning, they confirmed that they would follow the law and award damages according to the evidence).

---

and resolve conflicts in his testimony. *See Murff v. Pass*, 249 S.W.3d 407, 411 (Tex. 2008)*.* Viewing the evidence in the light most favorable to the trial court's ruling, the trial court apparently resolved any inconsistency in the veniremember's testimony against a finding of disqualification. *Id.*

[3] Indeed, as appellees note in their appellate brief, it may be the case that "[veniremember twenty-six] felt legislators should change the law to address lawsuit abuse. But [his] views about what the law *should be* were far different than his views on jury service—i.e., about whether, once the judge instructed him on existing law, he would be able to serve as a *fair factfinder*."

15

Furthermore, the judge had the benefit of observing firsthand the demeanor of veniremember twenty-six in making the factual determination as to whether he was sufficiently biased to merit disqualification. *See Burry*, 203 S.W.3d at 547.

Accordingly, we find that the trial court, being in a better position than us to observe the sincerity and capacity of veniremember twenty-six for fairness and impartiality, properly exercised its discretion in not disqualifying him. *See Cortez*, 159 S.W.3d at 94. We therefore overrule appellants' first issue.

### III. DIRECTED VERDICT AS TO ASHLEY

By their second issue, appellants challenge the trial court's decision to direct a verdict in favor of appellees on the basis that the evidence was legally insufficient to prove that Ashley is Jean's "child" under the Texas Wrongful Death Act. *See* TEX. CIV. PRAC. & REM. CODE ANN § 71.004(a).

### A. PERTINENT FACTS

The testimony at trial showed that Sylvia Roger and Jean met in New Orleans, Louisiana and were ceremonially married in 1993. Sylvia testified that at the time of their marriage in 1993, they had three children: Ashley, who was born in 1989; Jean Jr., who was born in 1991; and John, the youngest, who was born in the early part of 1993. Sylvia testified that she believed that only Jean Jr. and John were Jean's biological children and that Ashley, her oldest daughter, was not. However, there is no evidence in the record to indicate that Jean is not Ashley's biological father through paternity testing or the like.

The trial testimony and evidence showed that in 1995, two years after getting married, Sylvia and Jean made the decision to have her last name, and the last names of all three of their children, changed from Sylvia's maiden name (Harris) to Jean's last name (Roger). Sylvia testified that to effectuate this change, they went to the New

16

Orleans Vital Statistics Department, where Jean was asked a series of questions and completed paperwork to be listed as the father of their children. Concerning Ashley, Sylvia testified that a lady at the governmental office asked Jean whether he understood what he was doing and that Jean replied, "Yes." Sylvia also testified that the paperwork they completed meant "that [Jean] was claiming his kids. He was taking full responsibility as a father and giving them his last name." According to Sylvia, after they paid a fee and signed the necessary paperwork, she and Jean were issued birth certificates designating Jean as the father of their children. Ashley's birth certificate was admitted into evidence without objection, which lists Jean as her "father" and contains a certification by the State Registrar of Louisiana of the "birth facts" stated therein.

At trial, Ashley testified that she understood that by completing the paperwork and requesting that his name be designated as the father on her birth certificate, Jean took on the responsibility of being her father. Ashley also testified about how Jean protected and supported her, advised her on important decisions, and taught her life lessons.[4]

At the close of the evidence, appellees moved for a directed verdict on the basis that the evidence was legally insufficient to raise a fact issue as to whether Ashley is Jean's "child" under the Texas Wrongful Death Act. Specifically, appellees asserted that, under Texas law, only biological and legally adopted children of the decedent may recover in a wrongful death action. Appellees therefore argued that a directed verdict was proper as to Ashley because she provided no evidence that Jean is her biological or legally adopted father.

---

[4] The Roger family lived in New Orleans, Louisiana until Hurricane Katrina hit the gulf coast in 2005, which required them to evacuate the city and permanently relocate to Corpus Christi, Texas.

17

In response, appellants asserted that Louisiana law—not Texas law—governed whether Ashley qualifies as Jean's "child" for purposes of recovering under the Texas Wrongful Death Act. Appellants argued that there was at least a material fact issue as to whether Ashley is Jean's legal daughter under Louisiana law based on the evidence adduced at trial. Appellants therefore asserted that the directed verdict would be improper. Appellees countered that no material fact issue existed even if Louisiana law applied. After hearing the arguments of the parties on this issue, the trial court granted appellees' motion for directed verdict, which excluded Ashley from having her claim submitted to the jury.

### B. STANDARD OF REVIEW

A directed verdict is proper only under limited circumstances: "(1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue." *Thompson v. Stolar*, 458 S.W.3d 46, 63 (Tex. App.—El Paso 2014, no pet.) (citing *Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)). "In reviewing a directed verdict, we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not." *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). When the question to be decided is whether the party opposing the directed verdict raised a material fact issue, "we consider all the evidence in a light most favorable to the party against whom the verdict was instructed." *Id.* In doing so, "we disregard all contrary evidence and inferences, and we give the opposing party the benefit of any reasonable inferences created by the evidence." *Id.* (citing *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004)). If any conflicting evidence of probative value raises a material fact

18

issue on the question to be decided, then the directed verdict is improper because the question is for the jury to resolve.  *Id.* (citing *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994)).

### C. DISCUSSION

The purpose of the Texas Wrongful Death Act is to provide a means whereby surviving spouses, children, and parents can recover for the loss of a family member for wrongful death.  *Garza v. Maverick Market, Inc.*, 768 S.W.2d 273, 275 (Tex. 1989); *see also* TEX. CIV. PRAC. & REM. CODE ANN § 71.004(a).  By statute, recovery for wrongful death is afforded "the surviving spouse, children, and parents of the deceased."  TEX. CIV. PRAC. & REM. CODE ANN § 71.004(a).  The term "children" is not defined by the Act, but the prevailing judicial construction given that term by Texas courts is that it includes only biological and legally adopted children of the deceased and excludes equitably adopted children.  *See Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 275 (Tex. 1995) (citing *Goss v. Franz*, 287 S.W.2d 289, 290 (Tex. Civ. App.—Amarillo 1956, writ ref'd)); *Amos v. Cent. Freight Lines, Inc.*, 575 S.W.2d 636, 637–38 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ)*; see also* Jonny Heins*, Accounting for the Neglected: Taking Steps Toward More Equitable Treatment of Stepchildren in Texas's Wrongful Death Statute*, 50 HOUS. L. REV. 1473, 1482–1505 (2013) (discussing the *Faircloth*, *Goss*, and *Amos* opinions and noting the general disinterest among Texas courts to consider factors other than biological or adoptive status in deciding whether a child can recover under the Act).  However, we have found no Texas case addressing whether the term "children" in the Act excludes those who are not biologically related to or legally adopted by the decedent but who are nonetheless legally recognized by the decedent pursuant to the laws of the state in which a parent-children relationship is alleged to have been established.  In the absence of any

19

statutory limitation on the term "children"—and given Texas' embrace of the doctrine of comity with other states[5]—we believe that the legislature did not intend for the term to exclude children who are legally recognized by the decedent under the laws of another state, even where a biological or legally adoptive relationship to the decedent is said to be lacking.  Thus, we conclude that children who are legally recognized by the decedent under the law of another state are "children" under the Texas Wrongful Death Act.  In making this determination, we apply the law of the state in which the parent-child relationship is alleged to have been created and give full faith and credit to the public acts and records of that state.  *See Martinez v. Gutierrez*, 66 S.W.2d 678, 683 (Tex. Comm. App. 1933, holding approved) (holding that questions affecting the existence of an adoption or the method of its creation are controlled by the law of the state or nation that creates it, and the status created by that adoption will be recognized through comity of other states); *Nw. Nat'l Cas. Co. v. Douchette*, 817 S.W.2d 396, 399 (Tex. App.—Fort Worth 1991, writ denied) (same); *see also* U.S. CONST. art. IV, § 1.

Because the parties raised an issue as to whether Jean and Ashley created a parent-child relationship in Louisiana in 1995, the trial court was required to apply Louisiana law in deciding whether sufficient evidence raised a material fact issue that precluded a directed verdict.  *See Martinez*, 66 S.W.2d at 683.  And in doing so, the trial court was required to give full faith and credit to Ashley's birth certificate as an official record of Louisiana.  *See* U.S. CONST. art. IV, § 1.

Turning to Louisiana law, in 1995, it was possible for a child to have two different legal fathers under the concept of dual paternity:  (1) a biological father; and (2) a non-

---

[5] State-to-state comity is a principle of mutual convenience whereby one state will give effect to the laws and judicial decisions of another state.  *In re AutoNation, Inc.*, 228 S.W.3d 663, 670 (Tex. 2007).

biological father who legitimates his child pursuant to article 200 of the Louisiana Civil Code. *See* LA. CIV. CODE art. 200 (repealed in 2005); *see also Turner v. Busby*, 883 So. 2d 412, 418 (La. 2004) (considering whether the decedent legitimated the putative child under article 200 even when paternity testing established a zero percent probability that the child was the biological child of the decedent); *Warren v. Richard*, 296 So. 2d 813, 815–17 (La. 1974) (recognizing the possibility that a child may recover for the wrongful death of both her biological father and legal father).

Appellants did not argue to the trial court—and do not argue on appeal—that Jean is Ashley's biological or legally adopted father. Thus, the question is whether Jean legitimated Ashley pursuant to article 200 of the Louisiana Civil Code when the Bureau of Vital Statistics re-issued a birth certificate designating Jean as her father.

Article 200 of the Louisiana Civil Code, which was repealed in 2005, provided that "[a] father . . . shall have the power to legitimate his . . . illegitimate child [] by an act passed before a notary and two witnesses, declaring that it is [his intention] to legitimate such child[.]" LA. CIV. CODE art. 200. Appellees argue that evidence of Ashley's birth certificate—and Sylvia's testimony concerning the measures Jean took to obtain it—did not establish a valid article 200 legitimation because there was no evidence that Jean declared his intention to legitimate Ashley "by an act passed before a notary and two witnesses[.]" *See id.* We disagree.

Under Louisiana law, the Bureau of Vital Statistics is authorized to process a request for alteration of an original birth certificate upon proof of a valid "*legitimation* or acknowledgment[.]" LA. R.S. § 40:46(E) (emphasis added). And there is a presumption that the agency acts upon proper evidence when it alters a birth certificate. *See Culbert v. Culbert*, 356 So. 2d 1080, 1082 (La. Ct. App. 1978); *State v. City of New Orleans*, 78

21

So.2d 855, 857 (La. Ct. App. 1955). The record in this case reflects that appellees did not attempt to rebut the presumption that Jean provided proper evidence of a valid legitimation to the Bureau of Vital Statistics prior to being issued Ashley's birth certificate. Additionally, there was evidence that Jean had to formally declare his intention to legitimate Ashley before the Bureau of Vital Statistics issued the certificate, as Sylvia testified that Jean signed necessary paperwork and answered a series of questions, which, according to Sylvia, meant "that [Jean] was claiming his kids . . . taking full responsibility as a father and giving them his last name." *See Culbert*, 356 So. 2d at 1082 (holding that the evidence was sufficient to establish the decedent's acknowledgment of his legitimated child when (1) the Bureau of Vital Statistics issued an altered birth certificate naming the decedent as child's father, and (2) the child's mother testified that the decedent executed the required acknowledgment—even though no actual acknowledgment papers were introduced into evidence).

Viewing the birth certificate and the measures taken by Jean to obtain it in the light most favorable to Ashley, we believe that there is a material fact issue as to whether Jean accomplished a valid legitimation under article 200 of the Louisiana Civil Code. *See Hinojosa v. Columbia/St. David's Healthcare Sys.*, L.P., 106 S.W.3d 380, 387 (Tex. App.—Austin 2003, no pet.) (holding that a genuine fact issue precluding summary judgment remained in a wrongful death action based on evidence of the decedent's death certificate, which was prima facie evidence of the facts stated therein). Therefore, the directed verdict against Ashley was improper. We sustain appellants' second issue.[6]

---

[6] Moreover, though not argued at the directed verdict hearing, we believe that the evidence at trial raised a material fact issue as to whether Jean is Ashley's biological father—particularly because the record contains no evidence excluding Jean as Ashley's biological father through paternity testing. In reaching this decision, we recognize that Sylvia testified to her belief that Jean is not Ashley's biological father; we also recognize that parts of Ashley's testimony acknowledge the possibility that Jean is not her biological father. However, under our review, we must view the evidence in a light most favorable to a finding that

## D. REMEDY AS TO SYLVIA, JEAN JR., AND JOHN.

Having found that the directed verdict against Ashley was improper, we must determine the extent of appellants' remedy. There is no dispute that the improper directed verdict entitles Ashley to a new trial because it prevented her from submitting her claim to the jury. Therefore, we must reverse the part of the trial court's judgment that dismissed Ashley's claim and order a new trial as to her. *See* TEX. R. APP. P. 44.1(a)(1) (calling for reversal of the trial court's judgement on appeal when the error complained of "probably caused the rendition of an improper judgment"). The question is whether the improper directed verdict against Ashley also entitles the other members of the Roger family—Sylvia, Jean Jr., and John—to a new trial even though, as to them, the jury returned a total damage award in the amount of $1,305,628.50.

Texas Rule of Appellate Procedure 44.1(b) provides that "[i]f the error affects part of, but not all, the matter in controversy *and that part is separable without unfairness to the parties*, the judgment must be reversed and a new trial ordered only as to the part affected by the error." TEX. R. APP. P. 44.1(b) (emphasis added). The trial court's error in directing a verdict against Ashley concerns only part of the matter in controversy because it did not prevent Sylvia, Jean Jr., and John from submitting their claims to the jury. The issue under rule 44.1(b) then is whether reversing the judgment in part and

---

Jean *is* Ashley's biological father unless conclusive evidence shows that he is not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Here, Sylvia's belief that Jean is not Ashley's biological father—and Ashley's acknowledgment of that possibility—is not conclusive evidence of the fact of non-paternity. *cf. Murdock v. Murdock*, 811 S.W.2d 557, 560 (Tex. 1991) (holding that non-paternity was conclusively established when paternity testing excluded the alleged father); *City of Keller*, 168 S.W.3d at 816 (observing that "[e]vidence is conclusive only if reasonable people could not differ in their conclusions[.]"). Based on the birth facts found in Ashley's birth certificate, we believe that Ashley at least raised a material fact issue as to whether Jean is her biological father. *See Garza v. Maverick Market, Inc.,* 768 S.W.2d 273, 276 (Tex. 1989) (holding that if some evidence of paternity is offered, the question of whether the wrongful-death claimant is the biological child of the deceased is for the jury to resolve).

23

ordering a new trial only as to Ashley constitutes a disposition of this appeal that is "separable without unfairness" to Sylvia, Jean Jr., and John. *See id.*

Relying on rule 44.1(b), Sylvia, Jean Jr., and John argue that ordering a new trial only as to Ashley and not them would be unfair because the erroneous directed verdict probably tainted the jury's consideration of their claims. Specifically, they contend that after two weeks of trial, Ashley was "sudden[ly]" removed from the jury's consideration without a proper explanation given by the trial court as to the reason why it happened. Appellants assert that this left the jury to speculate that the "Roger family and their attorneys had been trying to fool them by misrepresenting Ashley's relationship with Jean." To support their claim that the jury imputed wrongdoing on the rest of the Roger family, appellants point to a portion of Ashley's cross examination, wherein appellees' counsel attempted to impeach Ashley's credibility by showing that she gave inconsistent discovery responses concerning the nature of her relationship with Jean. Our review of this portion of Ashley's testimony indicates that she stated in her original response to interrogatories that Jean was her "natural" father but then subsequently changed her answer in a supplemental response, stating: "[I am] not the natural child of [Jean]. [I] was recognized by the State of Louisiana as the legal child of [Jean] in approximately April 1995." Appellants argue that the jury held Ashley's inconsistent discovery responses against the entire Roger family in awarding damages to them—particularly because the trial court never told the jury that the directed verdict was not based on any impropriety on the part of the Roger family, but rather on a legal dispute between the parties as to the meaning of the term "child" in the Texas Wrongful Death Act. Appellants therefore assert that it would be unfair under rule 44.1(b) to reverse the trial court's judgment only as to Ashley and not order a new trial as to each member of the Roger family. We disagree.

24

Contrary to appellants' assertion on appeal, the jury was informed about Ashley's absence. The jury was told the following: "You saw from the court charge Ashley is not being submitted to you. As a matter of law, she's not been able to be submitted to you." Appellants argue that this explanation was not worded correctly to dispel the potential that the jury imputed wrongdoing on the Roger family for Ashley's absence. However, the record shows that the parties for the most part settled on the wording of this explanation after an extended pretrial discussion with the trial court about how to explain Ashley's absence.

Appellants nonetheless argue that the explanation given to the jury was ineffective because it came from their own counsel and not the trial court. It is true that the jury never heard the explanation come from the trial court. However, appellants never gave the trial court an opportunity to deny any request to have the explanation come from the trial court rather than appellants' own counsel. In fact, appellants' counsel asked for (and was granted) permission by the trial court to be the one to explain Ashley's absence to the jury.[7] Under these circumstances, appellants cannot now complain about the alleged ineffectiveness of a curative measure that they in large part advocated and approved. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) ("[A] party cannot complain on appeal that the trial court took a specific action that the complaining party requested, a doctrine commonly referred to as 'the invited error' doctrine."). Furthermore,

---

[7] The record shows that appellants' counsel gave the trial court the option to give him permission to instruct the jury:

[Appellants' counsel]:   Has the Court made a decision of whether the Court will say something about you granting a directed verdict because of [Ashley] not meeting the legal definition per the statute? Or is the Court okay with me saying something? What is the Court's preference?

[The Court]:   I'm okay with you saying something about that.

25

we must presume that the jury followed the trial court's instructions in assessing the claims submitted to them for consideration. *See First Heights Bank, FSB v. Gutierrez*, 852 S.W.2d 596, 615 (Tex. App.—Corpus Christi 1993, writ denied) ("Juries are presumed to follow the instructions given them by the court.").

Finally, appellants cite no legal authority to support their position that a separable-without-unfairness analysis under rule 44.1(b) is appropriate in this case, given the nature of the claims brought by them. Our independent research shows that the cases addressing the separable-without-unfairness requirement under rule 44.1(b) (formerly rule 81(b)(1)) have generally found that trial error affecting only part of a judgment requires reversal only as to that part of the judgment unless the claims and parties involved in the suit are so interwoven, intertwined, or dependent on each other that anything less than a reversal as to all claims and parties would be unfair. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 166 (Tex. 1982); *see also Pat Baker Co., Inc. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998). Our research also shows that the greatest concern for unfairness in separating parties upon remand arises in the context of suits involving multiple defendants that have asserted cross-claims and claims of indemnity against each other, where a partial retrial only as to one defendant or claim carries an "intolerable" possibility that a liability determination inconsistent with the one found in the first trial will impact the ultimate division of responsibility among all defendants. *See Brookhollow*, 642 S.W.2d at 166 (holding that upon remand by the appellate court, indemnity claim between the defendants had to be retried with cross-claim as it depended on the outcome of the negligence case against the indemnitor). In contrast to suits involving cross-claims and claims for indemnity among multiple defendants, the Texas Supreme Court has found that a partial retrial upon remand is not

26

unfair to the parties where, as here, multiple plaintiffs sue for the same negligent conduct of the defendant and the reversible error at issue affects only one plaintiff without directly impacting any other plaintiff's recovery. *See Pat Baker*, 971 S.W.2d at 450 (declining to find unfairness where none of the plaintiffs brought claims for indemnity or other dependent claims and where the respective recoveries of the plaintiffs did not directly affect each other). Given the independent nature of the claims brought by appellants and their independent recoveries in this case, we do not believe that a retrial only as to Ashley would be unfair to Sylvia, Jean Jr., and John under rule 44.1(b). *See id.*

### E. SUMMARY

To summarize the foregoing, we find that the trial court erred in directing a verdict against Ashley. As such, we reverse the portion of the trial court's judgment dismissing Ashley and remand her claim for a new trial. However, because we conclude that the part of the judgment dismissing Ashley's claim can be separated from the remainder of the judgment without unfairness to Sylvia, Jean Jr., and John, the judgment must be reversed and a new trial ordered only as to Ashley. *See* TEX. R. APP. P. 44.1(b)*; Pat Baker Co.*, 971 S.W.2d at 450.

## IV. CONCLUSION

We reverse the judgment of the trial court, in part, and remand the case for a new trial as to Ashley but affirm the judgment of the trial court in all other respects.


**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
12th day of November, 2015.

27